**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Donald A. WILLIS, Appellant.**

Superior Court of Pennsylvania.

Submitted May 20, 2013.

Filed June 12, 2013.

---

Keith J. Williams, Doylestown, for appellant.

David W. Heckler, District Attorney and Nathaniel F. Spang, Assistant District Attorney, Doylestown, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., PANELLA, J., and COLVILLE, J.*

OPINION BY STEVENS, P.J.

This is an appeal from the August 9, 2012 order entered in the Court of Common Pleas of Bucks County denying Appellant's first petition filed under the PCRA[1] after a panel of this Court vacated the PCRA court's original denial of collateral relief on the basis Appellant was denied the effective assistance of PCRA counsel. Upon remand, the PCRA court appointed new PCRA counsel, held a new PCRA evidentiary hearing, and, ultimately, denied Appellant's PCRA petition by order entered on August 9, 2012. Appellant now contends (1) his guilty plea was involuntarily and unlawfully induced by the ineffective assistance of guilty plea counsel and (2) his sentence is illegal. We affirm.

The relevant facts and procedural history are as follows: On May 27, 2009, Appellant entered a guilty plea to the offenses of homicide by vehicle while driving under the influence (DUI), homicide by vehicle, accident involving death or injury while not properly licensed, and DUI.[2] That same day, he was sentenced to 6½ to 13 years in prison, to be followed by a term of 7 years' probation. Appellant did not file a direct appeal; however, on February 16, 2010, he filed a timely *pro se* PCRA petition in which he presented claims of ineffective assistance of guilty plea counsel. The PCRA court appointed counsel, Ronald H. Elgart, Esquire, who filed a petition to withdraw and *Turner/Finley*[3] "no-merit" letter. Prior to ruling on Attorney Elgart's petition to withdraw, the PCRA court conducted a PCRA hearing, at which Attorney Elgart represented Appellant.

Subsequently, the PCRA court held a second PCRA hearing to address issues, which were raised by Appellant in a *pro se* amended PCRA petition and, once again, prior to the hearing, Attorney Elgart submitted a petition to withdraw and *Turner/Finley* "no-merit" letter. The PCRA court did not rule on Attorney Elgart's petition to withdraw prior to conducting the second hearing, and at the hearing, Attorney Elgart represented Appellant.

On November 23, 2010, the PCRA court denied Appellant's PCRA petition and granted Attorney Elgart permission to withdraw from representing Appellant. Appellant filed a direct appeal, and without reaching the merits of any issues presented on appeal, a panel of this Court concluded that Appellant was "effectively de-

---

* Retired Senior Judge assigned to the Superior Court.

**1.** Post Conviction Relief Act (PCRA), 42 Pa. C.S.A. §§ 9541–9546.

**2.** 75 Pa.C.S.A. §§ 3735(a), 3732, 3742.1, and 3802(a)(1), respectively.

**3.** *Commonwealth v. Turner,* 518 Pa. 491, 544 A.2d 927 (1988); *Commonwealth v. Finley,* 379 Pa.Super. 390, 550 A.2d 213 (1988).

nied his right to counsel in his first petition for post-conviction relief." *Commonwealth v. Willis,* 29 A.3d 393, 396 (Pa.Super.2011) (citations and footnote omitted). Specifically, the panel concluded that, by advocating against Appellant at the PCRA hearings, Attorney Elgart violated his duty to continue to represent Appellant until the PCRA court ruled on his petitions to withdraw. *See id.* Additionally, the panel noted the PCRA court compounded this error by failing to rule on Attorney Elgart's petitions to withdraw prior to the PCRA hearings, as well as permitting Attorney Elgart to advocate against Appellant at the hearings. *See id.* Thus, relinquishing jurisdiction, the panel vacated the PCRA court's November 23, 2010 order and remanded the matter for the appointment of new PCRA counsel and a new PCRA hearing. *See id.*

Upon remand, the PCRA court appointed Keith J. Williams, Esquire, to represent Appellant, Attorney Williams procured Appellant's medical records, and, on July 26, 2012, Attorney Williams represented Appellant at a PCRA hearing. Following the hearing, by order entered on August 9, 2012, the PCRA court denied Appellant's PCRA petition, and this timely, counseled appeal followed. The PCRA court directed Appellant to file a Pa.R.A.P. 1925(b) statement, counsel timely complied on behalf of Appellant, and the PCRA court filed a responsive Pa.R.A.P. 1925(a) opinion.

 Appellant's first contention is his guilty plea was involuntarily and unlawfully induced by the ineffective assistance of guilty plea counsel. Specifically, he alleges guilty plea counsel was ineffective in failing to obtain Appellant's Correctional Mental Health Records, thus leading to guilty plea counsel being unaware of Appellant's mental health issues (which included depression and alcohol abuse disor-

der) and the fact Appellant was under the influence of prescribed psychotropic medication (including Sinequan and Celexa) when he pled guilty. Appellant suggests that guilty plea counsel should have investigated whether Appellant had any mental health issues, including procuring his Correctional Mental Health Records, and notified the trial court of any information contained therein, including Appellant's mental health diagnosis and use of prescribed medication. Such information, Appellant suggests, would have led to a further inquiry as to whether Appellant was impaired or otherwise incompetent to plead guilty.

Our standard of review of the denial of a PCRA petition is limited to examining whether the court's determination is supported by the evidence of record and free of legal error. This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. Further, the PCRA court's credibility determinations are binding on this Court, where there is record support for those determinations. *Commonwealth v. Anderson,* 995 A.2d 1184, 1189 (Pa.Super.2010) (citations omitted).

To prevail on a claim alleging counsel's ineffectiveness under the PCRA, Appellant must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness, i.e. there is a reasonable probability that but for the act or omission in question the outcome of the proceedings would have been different.

It is clear that a criminal defendant's right to effective counsel extends to the plea process, as well as during trial. However, [a]llegations of ineffectiveness

in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused the defendant to enter an involuntary or unknowing plea. Where the defendant enters his plea on the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases.

*Commonwealth v. Wah,* 42 A.3d 335, 338 (Pa.Super.2012) (citations, quotation, and quotation marks omitted). "[T]he law does not require that [the defendant] be pleased with the outcome of his decision to enter a plea of guilty: All that is required is that [his] decision to plead guilty be knowingly, voluntarily, and intelligently made." *Anderson,* 995 A.2d at 1192 (citations, quotation, and quotation marks omitted).

 With regard to an attorney's duty to investigate, the Supreme Court has noted that the reasonableness of a particular investigation depends upon evidence known to counsel, as well as evidence that would cause a reasonable attorney to conduct a further investigation. *Commonwealth v. Hughes,* 581 Pa. 274, 865 A.2d 761 (2004). With regard to the voluntariness of a plea, a guilty plea colloquy must "affirmatively demonstrate the defendant understood what the plea connoted and its consequences." *Commonwealth v. Lewis,* 708 A.2d 497, 501 (Pa.Super.1998). Once the defendant has entered a guilty plea, "it is presumed that he was aware of what he was doing, and the burden of proving involuntariness is upon him." *Commonwealth v. Bedell,* 954 A.2d 1209, 1212 (Pa.Super.2008). Competence to plead guilty requires a finding that the defendant comprehends the crime for which he stands accused, is able to cooperate with his counsel in forming a rational defense, and has a rational and factual understanding of the proceedings against him. *Commonwealth v. Turetsky,* 925 A.2d 876 (Pa.Super.2007).

Here, during the lengthy guilty plea colloquy, the following relevant exchange occurred between the trial court and Appellant:

THE COURT: Now, how far did you go in school, sir?

[APPELLANT]: Couple years of college.

THE COURT: All right. Do you read, write and speak the English language?

[APPELLANT]: Yes, sir.

THE COURT: Are you under the influence of any drugs, alcohol, or medication at this time?

[APPELLANT]: No.

THE COURT: Are you under the care of a psychologist, a psychiatrist or any mental health professional for any issue related to some form of mental illness?

[APPELLANT]: Yes.

THE COURT: What would that be, sir?

[APPELLANT]: Just sleeping disorders from what had happened.

THE COURT: Are you taking any medication at this time?

[APPELLANT]: Yeah. But it doesn't affect my ability to make judgment or—

THE COURT: So you're not aware of anything that would preclude you in any way from understanding the nature of your actions today, the consequences of your actions, and making an informed decision about how you wish to proceed; is that correct?

[APPELLANT]: I understand everything.

THE COURT: All right.

\* \* \*

THE COURT: Now, obviously, today and throughout these proceedings, you have the right to be represented by

counsel. If you cannot afford one, one can be appointed to assist you. In this case Miss Faust from the Public Defender's Office is assisting you; is that correct?

[APPELLANT]: Yes.

THE COURT: She has had the opportunity to represent you throughout these proceedings, that's my understanding; is that right?

[APPELLANT]: Yes, sir.

THE COURT: Have you and she had the opportunity to discuss the evidence that has been gathered against you?

[APPELLANT]: Yes.

THE COURT: Have you and she had the opportunity to discuss any defenses you might have to the charges?

[APPELLANT]: Yes, sir.

THE COURT: Has she discussed with you what the potential sentences could be?

[APPELLANT]: Yes, sir.

THE COURT: Are you satisfied with her representation throughout these proceedings?

[APPELLANT]: Yes, sir.

\* \* \*

THE COURT: Has anybody threatened, forced or coerced you in any way into entering this plea of guilty?

[APPELLANT]: No, sir.

\* \* \*

THE COURT: Are you entering this plea knowingly, voluntarily and intelligently, and of your own free will? Is that correct, sir?

[APPELLANT]: Yes, sir.

N.T. 5/27/09, guilty plea hearing, at 3–4, 11–12, 22–23.

Additionally, during the July 26, 2012 PCRA evidentiary hearing, the issue of Appellant's mental health records, diagnosis, and taking of prescribed medications was fully explored. For example, Appellant testified on direct examination by PCRA counsel in relevant part as follows:

Q: At some point in time, you were represented by Ann Faust from the public defender's office?

A: Yes, sir.

Q: As a result of that, did you eventually dispose of this case though a plea?

A: Yes, sir.

Q: Prior to that plea, were you involved in any mental health treatment?

A: Yes, sir.

\* \* \*

Q: After your arrest on these charges you were incarcerated at the Bucks County Correctional Facility, correct?

A: Yes.

Q: While there, did you receive any mental health treatment or were you prescribed any medications?

A: Yes, I was seeing a doctor the whole time I was there and taking medication the whole time I was there.

Q: Do you recall what your diagnosis was while you were at the Bucks County Correctional Facility?

A: Not right off the top of my head. I know alcohol disorder was one of them.

Q: Do you recall telling them you were depressed?

A: Yes, depression disorder, NOS, whatever that means, and alcohol abuse disorder.

Q: As a result of that diagnosis, did they prescribe you medication?

A: Yes, sir.

Q: What medications were you on while at the Bucks County Correctional Facility?

A: 200 milligrams of Sinequan and 25 of Celexa.

**Q:** Were you actually on those medications at the time of your plea in this matter?

**A:** Yes, sir.

\* \* \*

**Q:** While you were in the Bucks County Correctional Facility receiving mental health treatment, were you also meeting with [your guilty plea counsel], Ms. Faust, in preparation of your case?

**A:** Yes, sir.

**Q:** At any point did you discuss with Ms. Faust that you were actually getting treatment through correctional mental health?

**A:** I don't remember mentioning anything to Ms. Faust.

**Q:** Do you remember ever mentioning to Ms. Faust that you were on medication for your mental health treatment?

**A:** I don't recall.

**Q:** Do you recall whether she ever even asked whether you were?

**A:** No.

**THE COURT:** No, you don't recall, or no, she did not ask?

**[APPELLANT]:** No, I don't believe she asked.

\* \* \*

**Q:** On May 27, 2009, do you recall entering a guilty plea in this matter?

**A:** Yes, sir.

\* \* \*

**Q:** At about Line 16 of Page 3, the Judge asked are you under the care of a psychologist, a psychiatrist, or any mental health professional for any issue related to some form of mental illness, and you answered yes; do you recall that?

**A:** Yes, sir.

**Q:** Then he went on to ask you what it was for. Do you remember what you told the Court? Again, it's Line 24 on Page 3.

**A:** Sleeping disorders.

**Q:** You didn't mention anything about depression, alcohol issues, any of these other diagnosis; is that correct?

**A:** Yes, sir.

**Q:** Can you tell us why that was?

**A:** The only thing I can explain for my answer there was I was in a very deep depression and I was highly medicated.

**THE COURT:** On that day, had you taken the medications prescribed by the physicians from the correctional facility?

**[APPELLANT]:** My medications were taken nightly, so I wouldn't have taken it that morning, sir.

**THE COURT:** Did you take them in accordance with the prescription from the therapist or doctor at the correctional facility?

**[APPELLANT]:** Yes, sir.

\* \* \*

**Q:** Can you tell the Court why you hadn't told your attorney or the Court that you had other mental health issues at the time of sentencing?

**A:** I really don't understand why I didn't give the explanation of my other issues.

**Q:** Were you at the time suffering any other stressors other than, obviously, the stress of the case and going to sentencing at that time?

**A:** That, and the fact that my wife had been threatened.

\* \* \*

**Q:** How did that affect your mental health status?

**THE COURT:** Let me back up here. [Counsel], are you referring to how did that affect his mental health status on the date of the entry of the guilty plea?

[APPELLANT'S PCRA COUNSEL]: Yes. I should clarify that.

Q: How was that affecting you on May 27, 2009?

A: I feared for my wife.

Q: Do you attribute that feeling to any of the reasons you may or may not have told the Court or your lawyer about what you were actually getting treated for?

A: Yes.

Q: We talked about what you told the Court about your mental health issues and the sleeping disorder. At any time prior to that sentencing date, did you indicate those same exact things to your attorney, Ms. Faust, that you were at least being treated for a sleeping disorder?

A: Not that I can recall.

Q: Do you recall whether she ever asked you about that?

A: No.

Q: No you don't recall, or no, she never asked you?

A: No, she never asked me.

Q: Do you believe that you were of your right mind and not influenced by medication at the time you entered this plea?

A: I believe due to a combination between deep depression and medication, I don't believe I was in the right state of mind to communicate with my attorney or enter a plea.

\* \* \*

Q: At no time during that whole plea did you ever say you just didn't feel right or feel you could go through with the plea; is that correct?

A: No.

Q: Can you tell us why that was?

A: It was a combination of depression and threats being made to my wife.

N.T. 7/26/12, PCRA hearing, at 6–17.

On cross-examination by the ADA at the PCRA hearing, when asked how the medication he was taking while at the Bucks County Correctional Facility affected his ability to think on the day he entered his guilty plea, Appellant initially gave no answer, and then indicated the medication made him "not care." N.T. 7/26/12, PCRA hearing, at 24–25. Upon further questioning, Appellant testified he was "pretty much tranquilized in the courtroom" during his guilty plea hearing. N.T. 7/26/12, PCRA hearing, at 30. However, Appellant admitted that he "never once complained to prison officials that [he was] tranquilized by th[e] combination of medication[.]" N.T. 7/26/12, PCRA hearing, at 30.

Appellant's guilty plea counsel, Attorney Faust, testified at the PCRA hearing, in relevant part, as follows upon examination by Appellant's PCRA counsel:

Q: Were you aware that within the first couple of days he was incarcerated he was put on suicide watch?

A: I don't remember that.

Q: If you were aware of that, would it be a normal course in your job to then follow up with correctional mental health about any treatment or what was being done with him?

A: Yes.

Q: In this case, did you ever contact correctional mental health, to the best of your recollection?

A: No, I did not.

\* \* \*

Q: At no time were you given any reason by your client to suspect that you needed to look at any records; is that correct? A: That's correct.

**Q:** In the normal course of representing clients in your experience as public defender, if someone is put on suicide watch, is that normally something that is brought to the attention of the public defender involved?

**A:** If a person was brought into the jail, put on suicide watch, and one of the attorneys at the prison was trying to interview them, if you called them down they might say we can't bring them now or they have to come down under guard because they are on suicide watch. I looked at the initial interview sheet and there was nothing about that. When I met [Appellant], he was not on any sort of watch. I would call for him and he just came down to see me.

**Q:** Do you recall the date you first saw him?

**A:** It would have been shortly—maybe a week after he came into the jail

\* \* \*

**Q:** If he couldn't be seen because he was on suicide watch, that should be noted somewhere in the file?

**A:** He would be able to be seen; he would just have to—when you called, someone on the monitor would say he is on suicide watch and he would be brought down with guards escorting him. There's nothing on that original interview sheet that would indicate that. . . . It is not indicated on the suicide watch at the time he was originally interviewed, and he certainly wasn't when I interviewed him.

\* \* \*

**Q:** Is there any mechanism that would trigger you to look at or contact correctional mental health unless the client told you he was getting mental health treatment? Is there any other mechanism that would give you any indication that you should do that?

**A:** The main mechanism is my dealing with him. If I have a client that appears to be suicidal or seems to be suffering from a mental health issue, if they are unable to communicate with me or I am having trouble, then we will refer them to correctional mental health or I'll contact correctional mental health to see if they are dealing with that.

Nothing about my dealings with [Appellant] gave me that impression. It was clear to me that he felt very, very bad about what happened. The victim, the young man that was killed, and his family were people that he was very close to and cared a great deal about, so I felt his demeanor was sad, appropriately so because of what happened, but I didn't feel that he was suffering from a major mental health illness or was suicidal such that it would have triggered, for me, the need to get him that treatment.

He didn't appear to be incompetent. He didn't appear to be insane. He didn't—like I said, my impression of him was that—and he always expressed that to me, that he was very sad about what he had—what had happened that night.

**Q:** So did he appear depressed then to you?

**A:** He appeared sad. I wouldn't say it was—when you have clients that are really, really depressed, sometimes you can't—they can't communicate to you. They won't respond to questions, they give up. They have said to me—I've had clients say I wish I were dead. They'll say things to you that make you feel—the red flags that make you want to follow up with them.

[Appellant] was always able to communicate with me, he was able to answer my questions. I would agree, though, that he felt very, very bad about what had happened.

**Q:** Were you aware that he was taking medication?

**A:** I don't remember that, no.

\* \* \*

**Q:** If you have found out that he was on medication, would you have checked what that medication was for?

**A:** Yes.

**Q:** And if you found out it was a psychotropic drug for depression, would you have tried to get the records from correctional mental health?

**A:** Yes, I would.

**Q:** Can you tell this Court whether or not you knew prior to the sentencing date that he was actually on medication?

**A:** I don't believe I did. I've never seen these records.

**Q:** But you heard him say that he was on medication?

**A:** Yes.

**Q:** And that he was being treated for some form of mental illness during the colloquy? Are you telling this Court that's the first time you heard it?

**A:** I believe it was.

**Q:** And you didn't ask to stop the plea, wait, I have to check this out, anything like that?

**A:** His responses to the Judge was that he understood what was happening, and my impression of [Appellant] was the same, that he was able to answer all the questions. There was nothing about my dealings with him which raised any red flags.

A lot of our clients are treated by correctional mental health, they get medication, and it doesn't necessarily play into the final resolution of the case. There are people that are being treated for sleep disorders or a variety of things, but in my dealings with [Appellant] it wasn't an issue.

N.T. 7/26/12, PCRA hearing, at 33–42.

Additionally, on examination by the ADA, Attorney Faust testified at the PCRA hearing, in relevant part, as following:

**Q:** In addition to [Appellant] not telling you that he was on medication inside the prison, is it true that he never told you he had been previously treated for mental health issues?

**A:** Yes, I didn't know about that.

**Q:** You were asked about what you had done at sentencing as far as presenting the records if you would have had them. Despite the fact you had no records, you certainly did present and [Appellant] did present that he was sad, upset, and felt horrible for what had happened, correct?

**A:** Yes.

**Q:** And you conveyed that to the Court the best way possible, as did [Appellant], correct?

**A:** Yes, I think he definitely presented that.

**Q:** Prior to [Appellant] entering his plea on May 27, 2009, did you have a chance to meet with him?

**A:** Yes, I did.

\* \* \*

**Q:** When you met with [Appellant] before entering his guilty plea on the 27th of May 2009, was there any indication to you that he was not of clear mind that morning?

**A:** None whatsoever.

**Q:** Did he seem to you, to use his term, tranquilized or slower than he usually was in answering your questions?

**A:** No.

**Q:** Was his speech slurred at all?

**A:** No.

**Q:** Was he able to provide appropriate answers to the questions you were asking him?

**A:** Yes.

**Q:** Was he able to engage in conversation with you?

**A:** Yes.

**Q:** Throughout the entirety of that morning both before the entry of the guilty plea, after the entry of the guilty plea before sentencing, and throughout the sentencing hearing, did that remain the same; in other words, did he ever give an indication that he was of anything less than clear mind that morning?

**A:** No, he did not.

\* \* \*

**Q:** I assume you met with [Appellant] on numerous occasions both leading up to the preliminary hearing and his trial, correct?

**A:** Yes.

**Q:** Approximately how many times do you believe you met with [Appellant]?

**A:** I don't know.

**Q:** Would it be fair to say at least ten times?

**A:** Probably, I'd say, between five and ten.

**Q:** Did he seem any different to you on the morning of May 27 than he did throughout the other meetings you had with him?

**A:** No.

\* \* \*

**Q:** Obviously, [Appellant] didn't tell you about the medication he was taking, so he never raised any issue to you that the medication was causing him to be unable to think clearly, correct?

**A:** No, he never told me that, and I didn't get that impression in speaking with him that he was having trouble finding words or . . .

**Q:** In your experience both as a criminal defense attorney, which it sounds like you have 24 years experience with that, and just in life experience, have you come in contact with individuals who are intoxicated or not of clear mind?

**A:** Yes.

**Q:** Did [Appellant] exhibit any signs that you recognized as familiar with— along the lines of intoxication or not being of clear mind?

**A:** No.

N.T. 7/26/12, PCRA hearing, at 44–49.

Moreover, the PCRA court questioned Attorney Faust regarding Appellant's competence, and in particular, they engaged in the following exchange:

**THE COURT:** Ms. Faust, you've had [an] opportunity over the last 45 minutes to an hour to observe [Appellant] this morning?

**MS. FAUST:** Yes.

**THE COURT:** Do you notice anything particular about his demeanor, his appearance, his ability to articulate and communicate that is substantially different from that which you observed about him on the date of the entry of the guilty plea?

**MS. FAUST:** No, it's very similar.

N.T. 7/26/12, PCRA hearing, at 55.

 Based on the aforementioned testimony, the PCRA court concluded Appellant was not entitled to relief on his claim of ineffective assistance of guilty plea counsel, and we find no error in this regard. *See Anderson, supra.* Specifically, as the PCRA court noted, Appellant made statements at the guilty plea colloquy, under oath, indicating he was not under the influence of any drugs, alcohol, or medication, he was not aware of anything that would preclude him from understanding

the nature of his entry of a guilty plea, and in fact, he understood everything. While Appellant admitted to the trial court he was being treated for "sleeping disorders," and taking prescribed medication, he specifically denied the medication affected his abilities or judgment. Appellant is bound by these statements, which he made in open court while under oath, and he may not now asserts grounds for withdrawing the plea which contradict the statements. *See Turetsky, supra.*

■ Additionally, despite Appellant's self-serving testimony that he felt "tranquilized" during the guilty plea hearing, Appellant's guilty plea counsel indicated Appellant appeared to be competent, he did not appear to be "tranquilized," his speech was not slurred, and he provided appropriate answers to questions. At no time did Appellant's guilty plea counsel observe any indication Appellant was less than clear of mind or under the influence of medication when he entered his guilty plea. Moreover, as indicated *supra,* the trial court judge, who was also the PCRA court judge, observed Appellant as he participated in a lengthy guilty plea colloquy, cogently answering each question addressed to him. As a result, the PCRA court concluded neither the medication Appellant was taking nor any mental illness interfered with Appellant's capabilities or rendered him incompetent to plead guilty. *See Turetsky, supra; Commonwealth v. Jackson,* 390 Pa.Super. 639, 569 A.2d 964 (1990) (holding the defendant was not entitled to withdraw his plea of *nolo contendere* on grounds he was taking medication where the court discussed prescription drugs with the defendant at time he entered the plea and the defendant showed no signs he did not understand the questions); *Commonwealth v. Hazen,* 315 Pa.Super. 557, 462 A.2d 732 (1983) (where the defendant was on medication

after an apparent suicide attempt, and he later asserted counsel was ineffective in permitting him to plead guilty since he felt tranquilized during the plea hearing, the defendant was not entitled to relief since counsel and the trial court indicated the defendant showed no signs of being under the influence of medication at the hearing). Simply put, the mere fact Appellant was taking prescribed psychotropic medication at the time of his plea does not, of itself, result in the conclusion he was unable to enter a knowing, voluntary, and intelligent guilty plea. *See Jackson, supra.*

■ Finally, as to whether guilty plea counsel was ineffective in failing to investigate and procure Appellant's Correctional Mental Health Records prior to the guilty plea hearing, we note Appellant has failed to demonstrate there was any evidence known to counsel which would have caused a reasonable attorney to conduct a further investigation into Appellant's mental health and medication usage. *See Hughes, supra.* Appellant admitted he never informed guilty plea counsel he was receiving treatment from the Correctional Mental Health Unit or taking any medication. Appellant could offer no legitimate explanation for his failure to inform guilty plea counsel of these facts. Additionally, guilty plea counsel testified that, prior to the guilty plea hearing, she met with Appellant five to ten times, and Appellant never gave her any reason to suspect she should examine his mental health history. She testified Appellant was able to communicate effectively with her, he did not appear to be incompetent, and he engaged in appropriate conversation. Guilty plea counsel confirmed Appellant never told her he was taking prescribed medications or that he had been treated for mental health issues. She indicated there was no notation made in his records that he had been on suicide

watch for the first two days he was in prison. Moreover, on the morning of the guilty plea hearing, she met with Appellant and he did not appear to be tranquilized or under the influence of medication; but rather, he appeared to be of "clear mind." Thus, we conclude Appellant has failed to meet his burden that guilty plea counsel was ineffective in this regard. *See Hughes, supra.*

Appellant's next contention is his sentence is illegal. Specifically, Appellant contends that, in addition to the two homicide by vehicles charges and the DUI charge, he pled guilty to the charge of accident involving death or personal injury while not properly licensed, 75 Pa.C.S.A. § 3742.1, which was listed as Count 4 on the criminal information. *See* N.T. 5/27/09, guilty plea hearing, at 2–3, 16–17. However, during the sentencing hearing, the trial court orally stated it was sentencing Appellant "[o]n Count 4 of the Bill of Information, that of leaving the scene of an accident[.]" N.T. 5/27/09, sentencing, at 58. Appellant contends the trial court did not have the authority to sentence Appellant for the crime of leaving the scene of an accident, 75 Pa.C.S.A. § 3742, and therefore, his sentence is illegal.

 It is well settled that, where there is a discrepancy between the sentence as written and orally pronounced, the written sentence generally controls. *Commonwealth v. Gordon,* 897 A.2d 504 (Pa.Super.2006). *See also Commonwealth v. Isabell,* 503 Pa. 2, 467 A.2d 1287 (1983) (indicating sentencing order controls over oral statements of sentencing judge not incorporated into signed judgment of sentence). Oral statements made by the sentencing court, but not incorporated into the written sentence signed by the court, are not part of the judgment of sentence. *Commonwealth v. Quinlan,* 433 Pa.Super. 111, 639 A.2d 1235 (1994). "A sentence, as

any other judgment, is construed in its entirety according to the canons of construction and so as to give effect to the intent of the sentencing court." *Commonwealth v. Fleming,* 332 Pa.Super. 118, 480 A.2d 1214, 1223–24 (1984) (emphasis omitted). Moreover, upon notice to the parties, the trial court may alter or modify a criminal sentence within thirty days after entry, if no appeal is taken. 42 Pa.C.S.A. § 5505.

 In the case *sub judice,* as Appellant indicates, Count 4 of the criminal information charged him with accident involving death or personal injury while not properly licensed, and during the oral guilty plea colloquy, the trial court specifically defined the offense, indicating its awareness that Appellant was pleading guilty to this charge. N.T. 5/27/09, guilty plea hearing, at 16–17. The trial court specifically noted "this is a felony of the third degree for which you could receive up to 7 years in jail and fines of up to $15,000." N.T. 5/27/09, guilty plea hearing, at 17. However, at the sentencing hearing, which occurred immediately after the guilty plea hearing, the trial court orally indicated "[o]n Count 4 of the Bill of Information, that of leaving the scene of an accident, it's ordered and directed that you undergo a consecutive period of incarceration at a state correctional institution of not less than 18 months nor more than 3 years." N.T. 5/27/09, sentencing, at 58. Our examination of the written sentencing order reveals the trial court sentenced Appellant on the correct charge for Count 4. That is, the written sentencing order reveals Appellant received a sentence of 1½ years to 3 years in prison for accident involving death or personal injury while not properly licensed, 75 Pa.C.S.A. § 3742.1. In its Rule 1925(a) opinion, the PCRA court judge, who was also the sentencing judge, indicated that he had inad-

vertently misspoke during the sentencing hearing and the totality of the record demonstrates that both Appellant and the sentencing court knew the offense for which Appellant was being sentenced was accident involving death or personal injury while not properly licensed. PCRA Court's Opinion dated 10/22/12 at 11. Additionally, as indicated *supra*, to the extent there is a discrepancy between the orally pronounced and written sentencing order, the written judgment of sentence prevails.[4] *Gordon, supra.* Thus, we find no merit to Appellant's legality of sentencing claim.[5]

For all of the foregoing reasons, we affirm.

Affirmed.

---

**4.** Appellant does not dispute the trial court's written sentencing order is legal.

**5.** Appellant makes a passing reference in his appellate brief to guilty plea counsel's failure to object to the sentencing court's oral mistake. In light of the fact Appellant neither developed this claim in his brief nor properly presented the issue in his court-ordered Pa. R.A.P. 1925(b) statement, we decline to address the issue further. *See* Pa.R.A.P. 1925, 2119.