J-A20018-14

2014 PA Super 209

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MIKECHEL BROOKER | |
| Appellant | No. 96 EDA 2013 |

Appeal from the Judgment of Sentence December 17, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006874-2009

BEFORE: FORD ELLIOTT, P.J.E., MUNDY, J., and MUSMANNO, J.

OPINION BY MUNDY, J.: **FILED SEPTEMBER 23, 2014**

Appellant, Mikechel Brooker, appeals from the December 17, 2012 aggregate judgment of sentence of 35 to 70 years' imprisonment, imposed after a jury found him and his co-defendants, Ferock Smith and Alonzo Ellison[1], guilty of murder in the first degree, criminal conspiracy, firearms not to be carried without a license, and possession of an instrument of a crime (PIC).[2] After careful review, we affirm.

In its opinion on Ellison's appeal, the trial court summarized the relevant facts and procedural history of this case as follows.

_____

[1] Smith's appeal is currently pending in this Court at 188 EDA 2013, and Ellison's appeal is currently pending at 2564 EDA 2012.

[2] 18 Pa.C.S.A. §§ 2502(a), 903(a)(1), 6106(a)(1), and 907(a), respectively.

On July 18, 2008, Barry Jacobs, Jr. ("Jacobs") was shot and killed on the 8700 Block of Glenoch Place in Philadelphia, by [Alfonso Ellison (Ellison)], Ferock Smith ("Smith") and [Appellant] in an apparent dispute over drug territory after Antoniette Gray ("Gray") refused to purchase drugs from [Ellison]. When Gray[,] shortly thereafter[,] purchased drugs from Jacobs, [Ellison], Smith, and [Appellant] shot Jacobs multiple times. At trial, Gray testified that she did not remember the shooting and her July 20, 2008, statement to police was admitted. In her statement, Gray identified [Ellison], Smith, and [Appellant] as the three people who shot Jacobs. Gray also saw [Ellison], Smith, and [Appellant] the next day and heard them laughing about shooting Jacob[s]. Another eyewitness, Jeffrey Gould ("Gould"), testified that he saw someone standing over Jacobs and shoot him in the head. Gould had identified that person as [Ellison] in a July 18, 2008 statement to police, which was introduced at trial.

At trial, Eleanore Sampson ("Sampson") testified that she did not remember the events after the shooting and her July 19, 2008 statement to police was admitted. In her statement, Sampson stated that [Ellison], Smith, and [Appellant] came to her apartment on the night of July 18, 2008. Sampson stated that she let [Ellison], Smith, and Brooker use her apartment because they gave her drugs. [Ellison], Smith and [Appellant], had a conversation in Sampson's apartment that night, during which she heard Smith say he shot Jacobs. Smith and [Appellant] had handguns with them which they placed in Sampson's apartment. Sampson asked [Ellison] to remove the guns from her apartment and [Ellison] took a 9 millimeter handgun from Smith. [Appellant] and Smith left Sampson's apartment shortly thereafter, at which time, [Ellison] gave the 9 millimeter handgun back to Smith. [Ellison] stayed and slept at Sampson's apartment and was arrested leaving from the rear of the apartment when the police were knocking at the front door. A .32 caliber handgun was found during

- 2 -

> a search of Sampson's apartment after [Ellison]'s arrest. …

Trial Court Opinion, 2564 EDA 2012, 12/26/12, at 2-3.

On June 1, 2009, the Commonwealth filed an information charging Appellant with the above-mentioned offenses, as well as one count each of persons not to use a firearm and carrying firearms in public in Philadelphia.[3] On July 10, 2012, Appellant proceeded to a jury trial. At the conclusion of said trial, on July 16, 2012, the jury found Appellant guilty of first-degree murder, criminal conspiracy, firearms not to be possessed without a license, and PIC. The Commonwealth *nolle prossed* the remaining two charges.

Relevant to this appeal, on November 21, 2012, Appellant filed a motion to declare 18 Pa.C.S.A. § 1102.1 unconstitutional as violating the Eighth Amendment and *Ex Post Facto* Clause of the Federal Constitution as well as the Original Purpose, Single Subject, and *Ex Post Facto* Clauses of the Pennsylvania Constitution. The Commonwealth filed its answer to Appellant's motion on December 11, 2012. On December 17, 2012, the trial court denied Appellant's motion and sentenced him to an aggregate term of 35 to 70 years' imprisonment for first-degree murder, six to 12 years' imprisonment for criminal conspiracy and no further penalty on any of the

---

[3] 18 Pa.C.S.A. §§ 6105(a.1)(1) and 6108, respectively.

remaining charges.[4]  **See** N.T., 12/17/12, at 16.  The sentences were to run concurrently.  Appellant did not file a post-sentence motion.  On January 2, 2013, Appellant filed a timely notice of appeal.

On January 17, 2013, the trial court entered an order directing Appellant to file a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).  Appellant timely filed his statement on January 22, 2013.  The trial court did not file a Rule 1925(a) opinion, as the trial judge who presided over the trial retired from the bench in the interim.  Upon application from Appellant, on August 20, 2013, this Court entered an order remanding this case to the trial court for the filing of a supplemental Rule 1925(b) statement.  Appellant filed his supplemental Rule 1925(b) statement on September 5, 2013, and the record was re-transmitted to this Court.

On appeal, Appellant raises the following six issues for our review.

> 1. Was the evidence sufficient to find [Appellant] guilty of first[-]degree murder where the Commonwealth failed to establish beyond a reasonable doubt that [Appellant] had the specific intent to kill?

---

[4] The written sentencing order in the certified record states the sentence as 35 years to life imprisonment.  **See** Sentencing Order, 12/17/12, at 1.  It is axiomatic that if there is a conflict between the sentence imposed in open court versus that contained in the trial court's written order, the sentence in the written sentencing order controls.  **See Commonwealth v. Willis**, 68 A.3d 997, 1010 (Pa. Super. 2013) (stating, "[i]t is well settled that, where there is a discrepancy between the sentence as written and orally pronounced, the written sentence generally controls[]") (citation omitted).

2.      Did the trial court err in denying the defense motion for mistrial where the improper question regarding prior bad acts by the [Commonwealth] had the unavoidable effect of prejudicing the jury against the [Appellant], and which could not be cured by court instruction or admonition to the jury?

3.      Was the law under which [Appellant] was sentenced unconstitutional because the original purpose of the bill for which he was sentenced dramatically changed during the legislative process in violation of Article III, Section 1 of the Pennsylvania Constitution?

4.      Was the law under which [Appellant] was sentenced unconstitutional because it contains more than one subject in violation of Article III, Section 3 of the Pennsylvania Constitution?

5.      Was the law under which [Appellant] was sentenced unconstitutional because it violates the United States and Pennsylvania constitutional bans on cruel and unusual punishment?

6.      Was the law under which [Appellant] was sentenced unconstitutional because it violates the [E]x [P]ost [F]acto [C]lauses of the United States and Pennsylvania Constitutions?

Appellant's Brief at 3-4.

We begin with Appellant's first issue regarding the sufficiency of the Commonwealth's evidence. Our standard of review regarding challenges to the sufficiency of the Commonwealth's case is well settled. "In reviewing the sufficiency of the evidence, we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light

most favorable to the Commonwealth as the verdict winner, support the jury's verdict beyond a reasonable doubt." **Commonwealth v. Patterson**, 91 A.3d 55, 66 (Pa. 2014) (citation omitted). "The Commonwealth can meet its burden by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." **Commonwealth v. Watley**, 81 A.3d 108, 113 (Pa. Super. 2013) (*en banc*) (internal quotation marks and citation omitted), *appeal denied*, --- A.3d ---, 1033 MAL 2013 (Pa. 2014). As an appellate court, we must review "the entire record … and all evidence actually received[.]" **Id.** "[T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence." **Commonwealth v. Kearney**, 92 A.3d 51, 64 (Pa. Super. 2014) (citation omitted). "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Diamond**, 83 A.3d 119, 126 (Pa. 2013) (citation omitted).

Appellant challenges the sufficiency of the Commonwealth's evidence regarding his conviction for murder in the first degree. Specifically, Appellant argues the Commonwealth did not present sufficient evidence of a specific intent to kill for murder in the first degree. **Id.** at 11. The relevant statute provides as follows.

**§ 2502. Murder**

**(a) Murder of the first degree.--**A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

…

**(d) Definitions.--**As used in this section the following words and phrases shall have the meanings given to them in this subsection:

…

**"Intentional killing."** Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

…

**"Principal."** A person who is the actor or perpetrator of the crime.

18 Pa.C.S.A. § 2502. Furthermore, our Supreme Court has consistently stated when proving the sufficiency of the evidence for first degree murder, the Commonwealth's burden is as follows.

> In order to sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. Specific intent and malice may be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body.

***Commonwealth v. Arrington***, 86 A.3d 831, 840 (Pa. 2014) (internal citation omitted).

In the case *sub judice*, the Commonwealth presented the testimony of Gray. Gray testified that she could not recall the events that transpired on the night of the shooting. N.T., 7/10/12, at 112-113. As a result, the Commonwealth admitted Gray's original witness statement to the police during Gray's testimony as substantive evidence. At the time of said statement, Gray told the police that she was only a few feet away from Jacobs when he was killed, and that she knew who killed him. *Id.* at 122. Recalling the events of July 18, 2008, Gray told the police that prior to the incident she had just bought a "dime bag" from Jacobs. *Id.* at 123.[5] Gray told the police that shortly after that, a man named Worm "just pointed a gun at [Jacobs] and shot him [in the head], like, two or three times." *Id.* at 123, 124-125. She further testified that after Jacobs fell to the ground, two other men named Butter and Doughnut each shot Jacobs in the head and in the chest while he was on the ground. *Id.* at 123-125. Gray was shown a photo array and picked out photographs of Appellant and his co-defendants as those who shot Jacobs. *Id.* at 148. In addition to Gray's statement, Eleanore Sampson, who was an acquaintance of all three defendants, identified Appellant as "Doughnut." N.T., 7/11/12, at 214.

Based on the above evidence, we reject Appellant's sufficiency argument. The Commonwealth presented substantive evidence that

---

[5] A "dime bag" is a term for $10.00 worth of crack cocaine. N.T., 7/10/12 at 123.

identified Appellant as one of the three men who shot Jacobs in the head and in the chest, through the account of an eyewitness who was only a few feet away at the time of the shooting. Pennsylvania courts have consistently held that such evidence is sufficient for a first-degree murder conviction. *See Commonwealth v. Mattison*, 82 A.3d 386, 392 (Pa. 2013) (concluding sufficient evidence existed where, "eye witness testimony demonstrate[d] that after [the defendant] … fatally shot the victim in the head at close range while the victim was lying defenseless on the ground[]"); *Commonwealth v. Chine*, 40 A.3d 1239, 1242 (Pa. Super. 2012) (concluding the defendant "surely intended the shooting to have fatal results as he fired three shots at the victim's head, a vital part of the body[]"), *appeal denied*, 63 A.3d 773 (Pa. 2013). As a result, Appellant is not entitled to relief on this issue. *See Diamond*, *supra*.

In his second issue, Appellant avers the trial court erred when it denied his request for a mistrial when the Commonwealth insinuated that Appellant was a drug dealer and that a dispute over drug turf was his alleged motive for the killing. Appellant's Brief at 14.

We begin by stating our standard of review.

> It is well-settled that the review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will … discretion is

abused. A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. A mistrial is not necessary where cautionary instructions are adequate to overcome prejudice.

*Commonwealth v. Fortenbaugh*, 69 A.3d 191, 193 (Pa. 2013) (citation omitted); *see also Commonwealth v. Culver*, 51 A.3d 866, 871 (Pa. Super. 2012) (stating, "we review the trial court's determination that a new trial was warranted due to prosecutorial misconduct for abuse of discretion[]") (citation omitted).

Appellant's argument as to this issue is limited to the following incident, which occurred during the Commonwealth's redirect examination of Detective Thomas Gaul.

> [Commonwealth]: Based on the information you received -- and [defense counsel] has asked about [Jacobs], and the information that he was actively dealing in that same area; correct?
>
> [Detective Gaul]: Yes, ma'am.
>
> [Commonwealth]: Based on the information that you received from the witnesses -- were these three defendants also actively dealing in that area?
>
> …
>
> [Defense Counsel]: Objection.
>
> …
>
> [Trial Court]: Sustained. The jury will absolutely disregard that last question.

- 10 -

And [Commonwealth], you're done with your direct.

…

Members of the jury, you will totally disregard the last question. It insinuated things that are not relevant to this case. That should not be considered by you. That should have no part in any consideration or discussions that you have during your deliberations.

…

[Ellison's counsel]: Just for the record, notwithstanding the admonition, for the record, I make a motion for a mistrial based on counsel's last question.

[Trial Court]: Denied.

[Appellant's counsel]: We join in that, Your Honor.

N.T., 7/12/12, at 131-132, 134.

Assuming *arguendo* that the Commonwealth's remark was improper, it does not follow that a new trial is warranted if the error is harmless. "[A]n error may be considered harmless only when the Commonwealth proves beyond a reasonable doubt that the error could not have contributed to the verdict." ***Commonwealth v. Luster***, 71 A.3d 1029, 1046 (Pa. Super. 2013) (*en banc*) (citation omitted), *appeal denied*, 83 A.3d 414 (Pa. 2013).

The Commonwealth bears the burden of establishing the harmlessness of the error. This burden is satisfied when the Commonwealth is able to show that: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to

the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial [e]ffect of the error so insignificant by comparison that the error could not have contributed to the verdict.

***Commonwealth v. Green***, 76 A.3d 575, 582 (Pa. Super. 2013) (citation omitted), *appeal denied*, 87 A.3d 318 (Pa. 2014).

In this case, the Commonwealth presented independent evidence that Appellant sold drugs. The following exchange occurred during Sampson's direct examination with the Commonwealth.

[Commonwealth]: Do you see Butter in the courtroom today?

[Sampson]: I'm not sure. I'm not sure which one it is. Wait a minute. I think it's [sic] the middle one is Butter I think.

[Commonwealth]: Okay. Your Honor, for the record identifying Alonzo Ellison by point of finger and also by location in relation to the other defendants. … How did you know Butter?

[Sampson]: Through drug activity.

[Commonwealth]: What do you mean?

[Sampson]: I would get drugs from him.

…

[Commonwealth]: Do you know someone by the name of AI or Doughnut?

[Sampson]: Yes.

[Commonwealth]: Do you see that person in the courtroom today?

- 12 -

[Sampson]:    I think this one on the end in the blue shirt.

[Commonwealth]:    Your Honor, for the record, identifying [Appellant], Mikechel Brooker. … How did you know Doughnut or AI?

[Sampson]:    For the same thing, for the same reasons, drugs.

[Commonwealth]:    Would you get drugs from Doughnut?

[Sampson]:    Yes.

*Id.* at 213-214.

Based on this testimony, at a minimum, we conclude that any error was harmless in this instance. At no point did Appellant lodge an objection to Sampson's testimony that indicated Appellant sold drugs. Thus, the reference in question by the Commonwealth during Detective Gaul's redirect regarding Appellant selling drugs was harmless as it was *de minimis* and "was merely cumulative of other untainted evidence[.]" **Green**, **supra**. Therefore, Appellant is not entitled to relief on this issue.

Appellant's remaining issues on appeal pertain to the constitutionality of 18 Pa.C.S.A. § 1102.1, the statute under which he was sentenced. Appellant raises four separate constitutional challenges under the Federal and Pennsylvania Constitutions. Section 1102.1 provides, in relevant part, as follows.

**§ 1102.1. Sentence of persons under the age of 18 for murder, murder of an unborn child and murder of a law enforcement officer**

**(a) First degree murder.--**A person who has been convicted after June 24, 2012, of a murder of the first degree, first degree murder of an unborn child or murder of a law enforcement officer of the first degree and who was under the age of 18 at the time of the commission of the offense shall be sentenced as follows:

> (1) A person who at the time of the commission of the offense was 15 years of age or older shall be sentenced to a term of life imprisonment without parole, or a term of imprisonment, the minimum of which shall be at least 35 years to life.

> (2) A person who at the time of the commission of the offense was under 15 years of age shall be sentenced to a term of life imprisonment without parole, or a term of imprisonment, the minimum of which shall be at least 25 years to life.

…

18 Pa.C.S.A. § 1102.1(a). This statute was enacted in response to the United States Supreme Court's decision in ***Miller v. Alabama***, 132 S. Ct. 2455 (2012). As we explain in more detail below, in ***Miller***, the Supreme Court held the Cruel and Unusual Punishment Clause of the Federal Constitution forbids the imposition of a mandatory sentence of life imprisonment without the possibility of parole upon a minor, even for a homicide.

"We note that duly enacted legislation carries with it a strong presumption of constitutionality." *Commonwealth v. Turner*, 80 A.3d 754, 759 (Pa. 2013) (citation omitted). "A presumption exists '[t]hat the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth' when promulgating legislation." *Commonwealth v. Baker*, 78 A.3d 1044, 1050 (Pa. 2013) (citation omitted), *accord* 1 Pa.C.S.A. § 1922(3).

> In conducting our review, we are guided by the principle that acts passed by the General Assembly are strongly presumed to be constitutional, including the manner in which they were passed. Thus, a statute will not be found unconstitutional unless it clearly, palpably, and plainly violates the Constitution. If there is any doubt as to whether a challenger has met this high burden, then we will resolve that doubt in favor of the statute's constitutionality.

*Commonwealth v. Neiman*, 84 A.3d 603, 611 (Pa. 2013) (internal quotation marks and citations omitted). As the constitutionality of a statute presents a pure question of law, our standard of review is *de novo* and our scope of review is plenary. *Turner*, *supra*. Appellant's first claim is that Section 1102.1 violates the Original Purpose Clause of the Pennsylvania Constitution. Appellant's Brief at 17.

Article III, Section 1 of the Pennsylvania Constitution states that, "[n]o law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original

purpose." Pa. Const. art. III, § 1. Our Supreme Court has directed that courts follow a two-part inquiry to determine whether legislation violates the Original Purpose Clause.

> First, the court will consider the original purpose of the legislation and compare it to the final purpose and determine whether there has been an alteration or amendment so as to change the original purpose. Second, a court will consider, whether in its final form, the title and contents of the bill are deceptive.

*Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 877 A.2d 383, 408-409 (Pa. 2005) (hereinafter *PAGE*).[6] The judicial department "is loathe to substitute our judgment for that of the legislative branch under the pretense of determining whether an unconstitutional change in purpose of a piece of legislation has occurred during the course of its enactment." *Id.* at 409. It is for this reason that our Supreme Court has instructed courts to look at a bill's original and final purpose "in reasonably broad terms." *Id.*

In the case *sub judice*, the parties appear to agree on what the original and final versions of the bills accomplished. The original bill, S.B.

---

[6] Our Supreme Court has also noted that the statute in question must satisfy both inquiries in order to survive Original Purpose Clause scrutiny. *See PAGE*, *supra* at 409 (stating, "[i]f the legislation passes both the purpose comparison and deception inquiries, it will pass constitutional muster[]"). In this case, Appellant rests his entire argument on the first prong and does not make any argument regarding deceptiveness. *See generally* Appellant's Brief at 17-22. As this issue is waiveable, we confine our discussion to the *PAGE*'s first prong. *See generally Watley*, *supra* at 117 (stating, "[t]he constitutionality of a statute can be waived[]").

850 was to create new offenses regarding cyberbullying and sexting by minors, modify expungement for, exclude the public from, and create referrals to alternative adjudication programs following hearings regarding summary offenses by minors, and create a presumption of indigency in juvenile division proceedings. Appellant's Brief at 17-18; Commonwealth's Brief at 24. Whereas the final version of the bill modified expungement requirements for underage drinking and summary offenses by minors, created the new Section 1102.1 and enacted a new chapter in the Crimes Code to create an "Office of the Victim Advocate" to advocate for juvenile crime victims. Appellant's Brief at 20-21; Commonwealth's Brief at 25. The final bill also excluded the public from juvenile summary offense hearings, created referrals to alternative adjudication programs for juvenile summary offenses, eliminated juvenile summary offenses as a basis for dependency, and established five-year intervals for parole applications for juvenile sentences under Section 1102.1. **Id.** The only disagreement between Appellant and the Commonwealth over the purpose of the legislation is the characterization of the original draft and final version of the bill and how broadly this Court should interpret their respective purposes for the Original Purpose Clause.

After careful consideration, we reject Appellant's argument. As stated above, we must read the purpose of legislation broadly when analyzing it under the Original Purpose Clause. **PAGE**, **supra**. The Commonwealth

argues, both the original and final versions of the bill amended various parts of the Juvenile Act as described above. The only significant change during the legislative process appears to be the removal of the new cyberbullying offense and, in its stead, the creation of Section 1102.1 and its corresponding parole statute. This is understandable because, as Appellant points out, **Miller** occurred **during** the legislative process.

The Pennsylvania Constitution also expressly contemplates legislative amendments. **See generally** Pa. Const. art. III, § 4 (stating, "[a]ll amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill and before the final vote is taken[]"). The occurrence of a constitutional decision of the United States Supreme Court does not give the General Assembly *carte blanche* to make amendments to a pending bill. However, it does not follow that adding remedial provisions that regulate other aspects of juvenile proceedings alters the bill's purpose in this instance. A comparison between the original and final purposes of the bill reveals that all parts of the legislation continued to pertain to regulating delinquency of juveniles, including sentencing for offenders under the age of 18. In our view, this commonality is sufficient for the Original Purpose Clause. **See, e.g.**, **Washington v. Dep't of Pub. Welfare**, 71 A.3d 1070, 1079-1080 (Pa. Cmwlth. 2013) (rejecting Original Purpose challenge where "its original purpose was to clarify eligibility requirements for certain public assistance benefits … [but its amendments

still made its purpose] the regulation and funding of human services programs regulated by the Department of Public Welfare[]"), *affirmed*, 76 A.3d 536 (Pa. 2013); **Christ the King Manor v. Dep't of Pub. Welfare**, 911 A.2d 624, 637 (Pa. Cmwlth. 2006) (rejecting Original Purpose challenge to the original bill, authorizing annual inspections on nursing homes although the final bill amended 24 other parts of the Public Welfare Code, where "[b]oth the original and final versions of HB 1168 share the central purpose of ensuring proper care for Pennsylvanians who need medical assistance[]"), *affirmed*, 951 A.2d 255 (Pa. 2008).[7] Based on these considerations, we conclude that Appellant is not entitled to relief under the Original Purpose Clause.

Appellant's second Pennsylvania state constitutional challenge concerns the Single Subject Clause. Appellant argues that Act 204 of 2012 "made extraordinary changes to Pennsylvania's sentencing statutes in a single omnibus bill that had no connection to the bill's original, narrow focused purpose." Appellant's Brief at 22. The Commonwealth counters that Act 204 has only one subject, "juvenile justice." Commonwealth's Brief at 29.

_____

[7] We note that decisions of the Commonwealth Court are not binding on this Court; however, they may be cited as persuasive authority. **Joseph v. Glunt**, --- A.3d ---, 2014 WL 2155396, *5 (Pa. Super. 2014) (citation omitted).

Article III, Section 3 of the Pennsylvania Constitution states that "[n]o bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof." Pa. Const. art. III, § 3. The Single Subject Clause "was first included by the framers of our Commonwealth's organic charter in 1864, and then readopted as part of the 1874 Constitution, in order to effectuate the electorate's overall goal of curtailing legislative practices that it viewed with suspicion." *Commonwealth v. Neiman*, 84 A.3d 603, 611 (Pa. 2013) (internal quotations marks and citation omitted). The Single Subject Clause historically reflects the People's disdain for two legislative practices.

> The first involved the insertion into a single bill of a number of distinct and independent subjects of legislation in order to deliberately hide the real purpose of the bill. The second was the practice of "logrolling" which involves embracing in one bill several distinct matters, none of which could singly obtain the assent of the legislature, and procuring its passage by combining the minorities who favored the individual matters to form a majority that would adopt them all."

*Id.* (some internal quotation marks and citations omitted). The Clause's historical purpose was also to engender more efficient policymaking. *Id.* at 611-612.

> The requirement that each piece of legislation pertain to only one subject creates a greater likelihood that it will receive a more considered and thorough review by legislators than if it is aggregated with other pieces of legislation pertaining

to different topics into a singular "omnibus bill," thereby creating a jumbling together of incongruous subjects. Additionally, and significantly, the single subject requirement proscribe[s] the inclusion of provisions into legislation without allowing for fair notice to the public and to legislators of the existence of the same. It, thus, provides a vital assurance to residents of this Commonwealth that they will be able to make their views and wishes regarding a particular piece of legislation known to their duly elected representatives **before** its final passage, and it concomitantly ensures that those representatives will be adequately apprised of the full scope and impact of a legislative measure before being required to cast a vote on it.

*Id.* at 612 (some internal quotation marks and citations omitted; emphasis in original). From these textual and historical guideposts, our Supreme Court has mandated a two-part test for the Single Subject Clause. "First, the title of the bill must clearly express the substance of the proposed law …. Second, the differing topics within the bill must be 'germane' to each other." *Id.* (citation omitted).

Similar to the Original Purpose Clause, in reviewing challenges to the Single Subject Clause, our Supreme Court "has acknowledged that some degree of deference to the General Assembly's prerogative to amend legislation is required, due to the normal fluidity inherent in the legislative process, and, thus, [it has] deemed it is appropriate for a reviewing court to hypothesize a 'reasonably broad topic' which would unify the various provisions of a final bill as enacted." *Id.* (citation omitted). Recognizing that some topics could be so broad as to render the Clause a dead letter, our

- 21 -

Supreme Court has instructed our inquiry to focus on "the various subjects contained within a legislative enactment and determine whether they have a nexus to a common purpose." *Id.* (citation omitted).

Appellant argues that the various subjects contained within Act 204 do not have such "a nexus to a common purpose." *Id.*; *see also* Appellant's Brief at 28. Rather, in Appellant's view, "the legislation [sought] to amend multiple and vastly different aspects of the criminal and juvenile justice systems." Appellant's Brief at 28. The Commonwealth sees Act 204 quite differently. The Commonwealth examines the Act's provisions and concludes that "all of the provisions of Act 204 are directed at the juvenile justice system." Commonwealth's Brief at 32. The Commonwealth further argues that the Single Subject Clause is not intended to hamper the legislative process by proscribing the "changing [and] creating [of] many individual laws when [the General Assembly] wishes to address a broad subject." *Id.* at 32-33.

As noted above, the final version of Act 204 created Section 1102.1, modified expungement requirements for certain offenses, created an "Office of the Victim Advocate" for victims of juvenile crime, excluded the public from juvenile summary offense hearings, created referrals to alternative programs for juvenile offenders, eliminated juvenile summary offenses as a basis for dependency, and established five-year intervals for parole applications for sentences imposed under Section 1102.1. Appellant's Brief

- 22 -

at 20-21; Commonwealth's Brief at 25. All of these provisions pertain to the consequences of criminal offenses committed by those under the age of 18.

Although Section 1102.1 and the parole section each pertain to minors sentenced as adults, we do not agree with Appellant's implicit argument that the Single Subject Clause inherently requires the General Assembly to change the juvenile division and criminal division in different legislation when each pertains to minors. The General Assembly addressed many changes it believed were required in order to remedy specific problems with minors charged with criminal offenses.

As noted above, *Miller* occurred during the legislative process. The legislature is permitted to make changes to pending legislation in order to respond to a constitutional decision of the United States Supreme Court, as long as the remedial changes are on the same subject. Here, the General Assembly was responding to the Supreme Court's judgment that minors could not be mandatorily sentenced to life imprisonment without the possibility of parole. The creation of new mandatory minimum sentences for juvenile offenders convicted of first-degree murder squarely fits within the subject of the consequences of criminal offenses committed by those offenders. Additionally, in our view, the nexus among Act 204's provisions is not "virtually boundless" as our Supreme Court has similarly found in previous Single Subject Clause cases. *Cf. Neiman*, *supra* at 613 (rejecting "refining civil remedies or relief … [and] judicial remedies and sanctions" as

too sweeping and broad for the Single Subject Clause[]"); *Pa. State Ass'n of Jury Comm'rs v. Commonwealth*, 64 A.3d 611, 619 (rejecting "powers of county commissioners" as too broad a subject); *City of Phila. v. Commonwealth*, 838 A.2d 566, 580 (Pa. 2005) (rejecting "municipalities" as too broad a topic for the purposes of the Single Subject Clause). Instead, Act 204's provisions address offenders under the age of 18, and the consequences of their criminal conduct. Based on these considerations, we conclude that Act 204 does not violate the Single Subject Clause.

We now turn to Appellant's federal constitutional challenges. Appellant avers that Section 1102.1 violates the Cruel and Unusual Punishment Clause of the Eighth Amendment since it "runs afoul with … [the] requirement of individualized sentencing and [the] requirement that children have a meaningful opportunity for release." Appellant's Brief at 32.

The Eighth Amendment to the Federal Constitution states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[8] U.S. Const. amend. viii. The Eighth Amendment is unique in constitutional jurisprudence because it "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1956)

---

[8] The Eighth Amendment is applicable to the States via incorporation under the Due Process Clause of the Fourteenth Amendment. *Hall v. Florida*, 134 S. Ct. 1986, 1992 (2014) (citation omitted).

(plurality). "[T]he Eighth Amendment's protection against excessive or cruel and unusual punishments flows from the basic 'precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense.'" **Kennedy v. Louisiana**, 554 U.S. 407, 419 (2008), *quoting* **Weems v. United States**, 217 U.S. 349, 367 (1910). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." **Hall v. Florida**, 134 S. Ct. 1986, 1992 (2014) (citation omitted).

In this case, Appellant argues that Section 1102.1 violates the Cruel and Unusual Punishment Clause because the statute imposes a mandatory minimum sentence of 35 years to life, and 35 years is essentially a life sentence. Appellant's Brief at 33. Appellant also argues that Section 1102.1 does not "compl[y] with the requirements of **Miller** that sentences be tailored to a child's individual level of culpability." **Id.** In addition, Appellant claims that a 35-year mandatory minimum sentence is not a "meaningful" opportunity to obtain release. **Id.** at 34.

Recently, this Court considered a similar Eighth Amendment challenge to Section 1102.1. In **Commonwealth v. Lawrence**, --- A.3d ---, 2014 WL 4212715 (Pa. Super. 2014), Lawrence argued "the statute impose[d] a mandatory minimum sentence of 35 years to life without giving any consideration to [Lawrence]'s age and attendant circumstances of youth." **Id.** at *2 (internal quotation marks, brackets, and citation omitted).

Lawrence also argued that Section 1102.1 "precluded the trial judge from taking into account [his] age at the time of the crime, his role in the crime, whether he posed a danger to society, and the familial and peer pressures that may have affected him."  *Id.* at *4 (citation omitted).  We rejected Lawrence's arguments as follows.

> The only preclusive effect of Section 1102.1 is that it divests the judge of discretion, in Appellant's case, to sentence him to a term of less than 35 years' imprisonment.  We decline to extend *Miller* beyond the mandatory schemes that it considered.  *Miller* is limited to legislative schemes which "require[ed] that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes[.]"  [*Id.* at 2475].  Section 1102.1 does not contain such a sentencing scheme.  In fact, Section 1102.1(d) **does** require the trial court to consider various age-related factors before the trial court may impose a sentence of life without parole.  *See* 18 Pa.C.S.A. § 1102.1(d).

> We do not read *Miller* to mean that the Eighth Amendment categorically prohibits a state from imposing a mandatory minimum imprisonment sentence upon a juvenile convicted of a crime as serious as first-degree murder.  Appellant's argument against a mandatory minimum of 35 years presents the same concerns as would a mandatory minimum of 35 days' imprisonment.  Stated another way, Appellant's position implicitly requires us to conclude that open-ended minimum sentencing is constitutionally **required** by the Cruel and Unusual Punishment Clause.  We decline to announce such a rule.

> If we were to agree with Appellant's argument, our decision would be contrary to the cases that the Supreme Court has already decided.  *See* [*Graham v. Florida*, 560 U.S. 48, 75 (2010)] (stating, "[a]

> State is not required to guarantee eventual freedom to a juvenile offender[]"). **Graham** held that the Eighth Amendment required juveniles convicted of [a] non-homicide offense to have "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." **Id.** **Miller** does not contain this requirement for juveniles convicted of first-degree murder, such as Appellant. Even under **Miller**, a state still may impose life without parole for homicide offenses, preventing a juvenile like Appellant, from ever obtaining any hope of release from confinement. Based on these considerations, we conclude that Section 1102.1 does not offend the Cruel and Unusual Punishment Clause of the Eighth Amendment.

**Id.** (footnotes omitted; emphasis in original).

We conclude **Lawrence** controls this case. Appellant's argument in this case, like the argument advanced in **Lawrence**, requires us to conclude that the Eighth Amendment inherently forbids mandatory minimum sentences. We disagree and reject that conclusion. In addition, we decline Appellant's implicit invitation in this case to extend **Graham** beyond the context in which it was decided. Although 35 years is a lengthy sentence, in our view, it still provides a "meaningful" opportunity for release. The Eighth Amendment does not dictate a specific minimum sentence, nor does it divest state legislatures of their authority to decide on such a minimum sentence.[9]

_____

[9] Appellant does not argue that a national consensus against 35-year minimum sentences exists so as to render it constitutionally prohibited under the Eighth Amendment. **See generally Hall**, **supra** at 1996, 1999; **Miller**, **supra** at 2470; **Graham**, **supra** at 61; **Kennedy**, **supra** at 426; **Roper v. Simmons**, 543 U.S. 551, 563 (2005); **Atkins v. Virginia**, 536 U.S. 304,
*(Footnote Continued Next Page)*

Additionally, our cases have concluded that even the chance of parole when a defendant is in his or her eighties is not the equivalent of a life sentence. *See, e.g.*, *Commonwealth v. Dodge*, 77 A.3d 1263, 1275 (Pa. Super. 2013) (concluding that a "sentence [that] would allow [a defendant] to be paroled in his early eighties … though lengthy, is not the equivalent of a life sentence[]"). As Appellant acknowledges in his brief, Appellant will be eligible for parole in his fifties, which does not render the instant sentence equivalent to a life sentence. *See id.* Based on these considerations, we conclude that Appellant is not entitled to relief on Eighth Amendment grounds.

Appellant's final issue is that Section 1102.1's application to him violates the *Ex Post Facto* Clause. Specifically, Appellant argues that Section 1102.1's application to his case violates the *Ex Post Facto* Clause because it "inflict[s a] greater punishment[] than the punishment available for the crime at the time it was committed." Appellant's Brief at 34. The

*(Footnote Continued)* ───────────────

316 (2002). In his reply brief, Appellant cites to one case from the Supreme Court of Iowa, invalidating a 35-year minimum sentence for a juvenile, however, this does not rise to the level of a national consensus. Appellant's Reply Brief at 17, *citing* **State v. Pearson**, 836 N.W.2d 88 (Iowa 2013). We also note that the Supreme Court of Iowa decided to independently apply the protections of Article I, Section 17 of the Iowa Constitution, meaning that **Pearson** is not an Eighth Amendment case. **See Pearson** at 96 (stating, "we need only decide that [A]rticle I, [S]ection 17 requires an individualized sentencing hearing where, as here, a juvenile offender receives a minimum of thirty-five years imprisonment without the possibility of parole for these offenses and is effectively deprived of any chance of an earlier release and the possibility of leading a more normal adult life[]").

Commonwealth counters that Section 1102.1 is not an *ex post facto* law because it decreased his punishment, and did not lengthen Appellant's maximum sentence. Commonwealth's Brief at 37, 38. For the reasons that follow, we reject Appellant's *Ex Post Facto* Clause argument, but on slightly different grounds than those urged by the Commonwealth.[10]

Article I, Section 10 of the Federal Constitution prohibits the several States from enacting any "*ex post facto* Law[.]" U.S. Const. art. I, § 10.[11] The Supreme Court has historically analyzed challenges under the *Ex Post Facto* Clause pursuant to four distinct categories, as identified by Justice Samuel Chase in **Calder v. Bull**, 3 U.S. (Dall.) 386 (1798).

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that

---

[10] We may affirm the trial court on any legal basis supported by the record. **Commonwealth v. Charleston**, 16 A.3d 505, 529 n.6 (Pa. Super. 2011) (citation omitted).

[11] Likewise, Article I, Section 17 of the Pennsylvania Constitution states that "[n]o *ex post facto* law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed." Pa. Const. art. I, § 17. This Court has recently explained that "the standards applied to determine an *ex post facto* violation under the Pennsylvania Constitution and the United States Constitution are comparable." **Commonwealth v. Rose**, 81 A.3d 123, 127 (Pa. Super. 2013) (*en banc*), *appeal granted*, --- A.3d ---, 2014 WL 3107989 (Pa. 2014). As Appellant does not argue that the Pennsylvania Constitution provides greater protection than the Federal *Ex Post Facto* Clause, we confine our discussion to Article I, Section 10 of the Federal Constitution.

changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Id.* at 390 (Opinion of Chase, J.).[12]  Appellant argues that this case deals with *Calder*'s third category, a law "that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed[.]" *Id.* "The touchstone of this Court's inquiry is whether a given change in law presents a 'sufficient risk of increasing the measure of punishment attached to the covered crimes.'" *Peugh v. United States*, 133 S. Ct. 2072, 2082 (2013) (citation omitted).

As the Supreme Court recently pointed out, "[t]he phrase '*ex post facto* law' was a term of art with an established meaning at the time of the framing." *Id.* at 2081. Many of the early justices of the Supreme Court "viewed all *ex post facto* laws as 'manifestly *unjust and oppressive.*'" *Carmell v. Texas*, 529 U.S. 513, 532 (2000) (emphasis in original), *quoting Calder*, *supra* at 391 (Opinion of Chase, J.). Indeed, Alexander Hamilton believed the Clause was designed to protect against "the favorite and most formidable instruments of tyranny[.]" *Id.*, *quoting* The Federalist, No. 84, at 512 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Therefore, the

---

[12] In the early days of the Court's history there often was no single opinion for the Court and the justices delivered their opinions *seriatim*.

framers sought to vindicate several important interests of the People through the *Ex Post Facto* Clause. For example, "the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." ***Weaver v. Graham***, 450 U.S. 24, 28-29 (1981). The Clause also "restricts governmental power by restraining arbitrary and potentially vindictive legislation." ***Id.*** As the Supreme Court's *Ex Post Facto* Clause jurisprudence has developed, a general proposition has emerged that any prohibition against a law to be applied retroactively must serve **some** of the interests of the Clause.

In ***Dobbert v. Florida***, 432 U.S. 282 (1977), the defendant was convicted of two counts of first-degree murder of his children, committed between December 31, 1971 and April 8, 1972. ***Id.*** at 284. At the time of his crimes, Florida's death penalty statute required "punish[ment] by death unless the verdict included a recommendation of mercy by a majority of the jury." ***Id.*** at 288 (citations omitted). On June 22, 1972, the Supreme Court struck down a Georgia death penalty statute as violating the Cruel and Unusual Punishment Clause of the Eighth Amendment, which resulted in a sea of change across the country regarding death penalty legislation. ***See generally Furman v. Georgia***, 408 U.S. 238 (1972). Shortly thereafter, the Supreme Court of Florida struck down the Florida death penalty statute as inconsistent with ***Furman*** and the Florida legislature enacted a new

statute at the end of 1972. ***See generally Donaldson v. Sack***, 265 So. 2d 499 (Fla. 1972). The new statute mandated a separate sentencing hearing, required that certain aggravating or mitigating evidence be admitted, and that the jury render an advisory decision by a majority vote that is not binding on the trial court.[13] ***Dobbert***, ***supra*** at 289 (citations omitted). In ***Dobbert***, the new statute was applied and the jury voted 10-2 against the death penalty, but the trial court overrode the jury's recommendation and sentenced Dobbert to death. ***Id.*** at 287.

Similar to what Appellant argues in this case, Dobbert argued that he was subject to an *ex post facto* law because the judicial determination that the existing death penalty statute was unconstitutional and the retroactive application[14] of ***Furman***, "at the time he murdered his children there was no death penalty 'in effect' in Florida." ***Id.*** at 297. Therefore, Dobbert argued

---

[13] This statute was upheld as constitutional by the Supreme Court in 1976. ***See generally Proffitt v. Florida***, 428 U.S. 242 (1976).

[14] At the time of ***Dobbert***, the controlling rule was that new federal constitutional rules must be "applied to cases still pending on direct review at the time it was rendered." ***Linkletter v. Walker***, 381 U.S. 618, 622 (1965). In 1989, the Supreme Court displaced ***Linkletter*** in ***Teague v. Lane***, 489 U.S. 288 (1989). However, even under ***Teague***, "new rules of criminal procedure must be applied in future trials and in cases pending on direct review … [t]his is the substance of the '***Teague*** rule[.]'" ***Danforth v. Minnesota***, 552 U.S. 264, 266 (2008). ***Teague*** is now considered the leading case for the scope of retroactive effect to be given to new constitutional Supreme Court rules to future trials, cases on direct appeal, and on collateral review. Nevertheless, there was no doubt that ***Furman*** applied to Dobbert's case.

the application of the new death penalty statute to his case was *ex post facto*. **Id.** at 298.

The Supreme Court squarely rejected Dobbert's argument as inconsistent with the guiding interests of the *Ex Post Facto* Clause.

> [Dobbert's] sophistic argument mocks the substance of the Ex Post Facto Clause. Whether or not the old statute would in the future, withstand constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers. The statute was intended to provide maximum deterrence, and its existence on the statute books provided **fair warning** as to the degree of culpability which the State ascribed to the act of murder.
>
> [Dobbert]'s highly technical argument is at odds with the statement of this Court in ***Chicot County Drainage District v. Baxter State Bank***, 308 U.S. 371, 374 (1940):
>
> > The courts below have proceeded on the theory that the Act of Congress, having been found to be unconstitutional, was not a law; that it was inoperative, conferring no rights and imposing no duties, and hence affording no basis for the challenged decree. It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. **The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored.**
>
> **Here the existence of the [old] statute served as an "operative fact" to warn the petitioner of the penalty which Florida would seek to impose on him if he were convicted of first-degree**

- 33 -

> **murder.** This was sufficient compliance with the *ex post facto* provision of the United States Constitution.

*Id.* at 297-298 (parallel and some internal citations omitted; emphases added).

In this case, Appellant argues that because of **Miller** and its retroactive application to his case, "no constitutional statutory sentence existed for him[]" at the time he committed the offense. Appellant's Brief at 35. Therefore, in Appellant's view, "the only constitutional sentence available to Appellant[] at the time of [his] crimes and convictions was the sentence for the most serious lesser included offense, which in this case was third-degree murder." *Id.* Therefore, Appellant concludes because he "faced a maximum constitutional sentence of 40 years imprisonment … [Section 1102.1]'s imposition of a minimum of 35 years to life or life without parole constitutes an unconstitutional *ex post facto* law." *Id.*

However, like in **Dobbert**, the very **existence** of the old statute requiring life without parole, put Appellant on notice that the Commonwealth would seek to impose a sentence of life imprisonment without the possibility of parole for the crime of murder in the first degree.[15] **See** 18 Pa.C.S.A. § 1102(a)(1). This was sufficient to serve as Appellant's "fair warning" as to

_____

[15] As Appellant was a minor at the time of the offenses, the Eighth Amendment precluded him from being eligible for the death penalty. **Roper**, **supra** at 578.

what Pennsylvania's considered judgment of a proper sentence would be in such a case. **See Weaver**, **supra**; **Dobbert**, **supra**. The fact that the old statute, Section 1102, would later be declared constitutionally void as applied to him on Eighth Amendment grounds is of no moment.[16] **See Dobbert**, **supra**. Rather, as we have explained in great detail, the underpinnings of the *Ex Post Facto* Clause protect fairness, fair warning and notice. **See Carmell**, **supra**; **Weaver**, **supra**. Because Section 1102 provided Appellant with fair notice and warning that he would receive life without the possibility of parole, he cannot complain of a retroactive imposition of a 35-year mandatory minimum, even though he may not have received such a high minimum sentence under **Batts**.

These considerations lead us to conclude that the underlying interests of the *Ex Post Facto* Clause were fulfilled in this case. **See Dobbert**, **supra**. Section 1102.1's retroactive application to Appellant's case is not the kind of "manifestly *unjust and oppressive*" law the Framers sought to prohibit. **See Calder**, **supra**. As a result, we conclude Section 1102.1's retroactive application to Appellant is consistent with the text, history of, and the cases

_____

[16] Section 1102 stated that "a person who has been convicted of a murder of the first degree or of murder of a law enforcement officer of the first degree shall be sentenced to death or to a term of life imprisonment in accordance with 42 Pa.C.S. § 9711." 18 Pa.C.S.A. § 1102(a). While not constitutionally void on its face, Section 1102 no longer has any constitutional application to minors in light of **Roper** and **Miller**.

interpreting the *Ex Post Facto* Clause. Therefore, Appellant's argument to the contrary must fail.

Based on the foregoing, we conclude all of Appellant's arguments are devoid of merit. Accordingly, the trial court's December 17, 2012 judgment of sentence is affirmed.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/23/2014