J-S01033-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| THOMAS G. MOORE | : | |
| | : | |
| Appellant | : | No. 1035 MDA 2017 |

Appeal from the PCRA Order May 30, 2017
In the Court of Common Pleas of Lancaster County
Criminal Division at No(s):  CP-36-CR-0000238-2015

BEFORE:  GANTMAN, P.J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED FEBRUARY 06, 2018**

Appellant, Thomas G. Moore, appeals *pro se* from the order entered in the Lancaster County Court of Common Pleas, which denied and dismissed his petition filed under the Post-Conviction Relief Act ("PCRA") at 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

In its opinion, the PCRA court fully and correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Appellant raises the following issues on appeal:

> WAS…APPELLANT COERCED INTO ENTERING AN UNLAWFULLY INDUCED GUILTY PLEA BY THE TRIAL COURT?
>
> WAS TRIAL COUNSEL INEFFECTIVE FOR ALLOWING AND COERCING APPELLANT TO ACCEPT AN INVOLUNTARY GUILTY PLEA AND FOR WITHHOLDING EXCULPA[TORY] EVIDENCE FROM APPELLANT?

(Appellant's Brief at 5, unpaginated).

Our standard of review of a grant or denial of a PCRA petition is limited to examining whether the evidence of record supports the court's determination and whether its decision is free of legal error. *Commonwealth v. Wholaver*, ___ A.3d ___, 2018 WL 359368 *4 (filed January 11, 2018). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. *Commonwealth v. Ward-Green*, 141 A.3d 527 (Pa.Super. 2016). We exercise *de novo* review over the PCRA court's legal conclusions. *Id.* A petitioner is not entitled to a PCRA hearing as a matter of right; the PCRA court can decline to hold a hearing if there is no genuine issue concerning any material fact, the petitioner is not entitled to PCRA relief, and no purpose would be served by any further proceedings. *Commonwealth v. Wah*, 42 A.3d 335, 338 (Pa.Super. 2012) (citing *Commonwealth v. Hardcastle*, 549 Pa. 450, 701 A.2d 541 (1997)).

After a thorough review of the record, the briefs of the parties, the applicable law, and the reasoned opinion of the Honorable David L. Ashworth, we conclude Appellant's issues merit no relief. The PCRA court opinion comprehensively discusses and properly disposes of the questions presented. (*See* PCRA Court Opinion, filed May 30, 2017, at 14-27) (finding: (**1-2**) plea court conducted lengthy inquiry at oral guilty plea colloquy on record; court advised Appellant of charges against him and

explained elements of those offenses; court also advised Appellant that he was waiving his right to jury trial and presumption of innocence; Appellant acknowledged he understood his rights, and it was his choice to plead guilty; during colloquy, court also reviewed maximum sentences and sentencing guidelines for each charge; Appellant stated he understood his maximum sentence; Commonwealth summarized on record factual basis for Appellant's guilty plea; Appellant admitted facts Commonwealth recited; Appellant signed written guilty plea colloquy; at oral colloquy, Appellant indicated he had reviewed written plea colloquy with counsel and had no questions for counsel or court regarding written plea colloquy; record establishes Appellant knowingly, voluntarily, and intelligently entered guilty plea; record belies Appellant's claim that despite colloquies, plea counsel induced Appellant to plead guilty by telling him if he proceeded to trial, he would receive death penalty and would not hold his child again; at guilty plea hearing, Appellant swore he had decided to plead guilty of his own volition and no promises, threats, or guarantees had been made to or against him to force his guilty plea; under terms of negotiated plea, Commonwealth agreed it would not seek death penalty and would *nolle pros* two other charges in exchange for plea; Appellant's responses at oral guilty plea colloquy made clear that he pled guilty to avoid possibility of death penalty; Appellant gained substantial benefit through guilty plea because he eliminated very real potential for death penalty as well as convictions and sentences on two

other charges; finally, threat of death penalty is not illegal inducement of guilty plea; Appellant's claim plea counsel was ineffective for failing to provide defense and exculpatory evidence in discovery is waived, because this ineffectiveness claim does not impact validity of Appellant's guilty plea; even if ineffectiveness issue were properly before court, Appellant failed to suggest any defense that plea counsel ignored; mental health defense was not viable because, at guilty plea hearing, Appellant admitted he had not been treated for mental illness and could read, write, and understand English language).  Accordingly, we affirm based on the PCRA court opinion.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 02/06/2018

**IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA**
**C R I M I N A L**

COMMONWEALTH OF PENNSYLVANIA :

             v.           :         No. 0238 - 2015

THOMAS GREGORY MOORE :

**O P I N I O N**

BY: ASHWORTH, J., MAY 30, 2017

Before the Court is the *pro se* petition of Defendant Thomas Gregory Moore filed

pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-46. Moore

pleaded guilty on February 5, 2016, to the murder of Nicole Mathewson in exchange for

the Commonwealth's agreement to withdraw the notice of aggravating circumstances to

support the death penalty, and to dismiss certain other charges. He received a life

sentence for murder in the first degree to be followed by a consecutive sentence of 20

to 40 years' incarceration on the remaining five related offenses. For the reasons set

forth below, Moore's *pro se* PCRA petition will be dismissed without a hearing.[1]

I. **Background**

The relevant facts and the procedural history of this case may be summarized as

follows.[2] On Monday, December 15, 2014, at approximately 9:10 a.m., Mathewson, a

---

[1]Under Rule 907 of the Pennsylvania Rules of Criminal Procedure, a PCRA court may dispose of post conviction collateral relief petitions without a hearing if it is satisfied after reviewing the materials submitted that no genuine issues of material fact exist and that the petitioner is not entitled to post conviction relief.

[2]I am adopting *in toto* the factual history set forth in my opinion of November 3, 2016, filed in the companion case of **Commonwealth v. Rutter** at Information No. 0287-2015, which disposed of that defendant's post-sentence motion to modify sentence. The Rutter transcripts,

32-year-old elementary school teacher, was found dead on her living room floor at 710 North Franklin Street in the City of Lancaster. (Rutter Nov. 3, 2016 Slip op. at 1.) Later that same day, the Lancaster City Bureau of Police received information that Marcus Rutter, who was then 16 years old, was in possession of an iPhone which appeared to have belonged to Mathewson. (Id.) Police went to Rutter's residence located at 730D East Marion Street in the City of Lancaster and spoke with his mother, Sherry Mount, and step-father, Brendon Mount, who also resided there. (Id. at 1-2.) After a consent to search was received from Rutter's parents, police seized an iPhone, iPad and laptop computer which they believed had been stolen from the home of Mathewson. (Id. at 2.)

Shortly thereafter, at approximately 10:00 p.m. on December 15, 2014, Rutter was taken into custody near his home for possession of stolen property. (Rutter Nov. 3, 2016 Slip op. at 2.) After signing a **Miranda** Warnings waiver, and in the presence of his mother, Rutter told the police that he and Moore had entered Mathewson's garage and home in the early morning hours of December 15, 2014. They took several items that belonged to Mathewson, including her car, iPhone, iPad and laptop. Later, they returned to her home to take more items. It was during this second illegal entry that Mathewson was killed.[3] (Id.)

---

exhibits, and pleadings from which the facts were culled have not been made a part of Moore's official file. Therefore, I have cited only to my November 3, 2016 slip opinion and have not included specific references to the Rutter record.

[3]Rutter was charged as a co-conspirator and entered an open guilty plea on July 11, 2016, to the charges of homicide, burglary, conspiracy, robbery, theft by unlawful taking, and access device fraud in exchange for the Commonwealth's agreement to dismiss the charges of theft by unlawful taking and involuntary deviate sexual intercourse, and to replace the charge of criminal conspiracy to commit burglary with conspiracy to commit murder. It was further agreed that a sentence of life without parole would not be imposed; however, the sentence on each count was to be served consecutively to one another. On July 29, 2016, Rutter was sentenced

2

From the record, developed at the Rutter pre-trial motions hearing, guilty plea proceeding and sentencing hearing, the following time line has been reconstructed. Sometime between 1:15 and 3:20 a.m. on the morning of December 15, 2014, Rutter and Moore walked from Rutter's home on East Marion Street to North Franklin Street, illegally entered the home of Nicole Mathewson, and took several items that belonged to Mathewson, including her iPad and laptop. (Rutter Nov. 3, 2016 Slip op. at 3.) The perpetrators also entered Mathewson's garage and stole her vehicle. Video evidence[4] captured Moore driving Mathewson's vehicle south on North Franklin Street at 3:22 a.m. with Rutter in the front passenger seat. They crossed over New Holland Avenue and continued straight on North Franklin Street to the 700 block of East Marion Street. (Id.)

Moore parked Mathewson's car near Rutter's home and they waited for Rutter's mother to leave the house for work. Sherry Mount told the police that she sent her son a message on Facebook at 3:35 a.m., asking where he was. (Rutter Nov. 3, 2016 Slip

---

to an aggregate term of 54 to 109 years' incarceration. For the offense of first degree murder, Rutter, as a juvenile, was sentenced to the mandatory minimum term of imprisonment of not less than 35 years nor more than 70 years. The following consecutive sentences were imposed for the remaining charges: 10 to 20 years' incarceration for conspiracy to commit murder; 5-1/2 to 11 years' incarceration for robbery; 2 to 4 years' incarceration for burglary; 9 to 24 months' incarceration for receiving stolen property; and 9 to 24 months' incarceration for access device fraud. (Rutter Nov. 3, 2016 Slip op. at 14-16.) Rutter filed a direct appeal to the Superior Court from his judgment of sentence of July 29, 2016, as finalized by the denial of his post sentence motion on November 3, 2016. See 1995 MDA 2016. That appeal is presently pending.

[4]The video evidence in this case was captured by the Lancaster Safety Coalition surveillance cameras, as well as private surveillance cameras at neighborhood businesses, including Turkey Hill, Adprints, Dolly's Laundry and Custom Hot Whips. (Rutter Nov. 3, 2016 Slip op. at 3 n.2.) The following note appears on the video timeline prepared by the Commonwealth: "Time stamps not calibrated between cameras from various systems. The mentioned time stamps are from each individual system and are an approximate time." (Id.) Some time stamps are off as much as four minutes. (Id.)

3

op. at 3.) When she received no response, she messaged him again at 3:39 a.m. telling him "that he better get up for a full day of school." (Id.) Again, she received no response. Mrs. Mount left the house and walked to work sometime between 3:40 and 3:50 a.m. (Id.)

After observing his mother leave for work, Rutter entered the home and dropped off Mathewson's iPad and laptop in his room. (Rutter Nov. 3, 2016 Slip op. at 4.) At approximately 4:22 a.m., Rutter and Moore are seen on camera walking north on North Franklin Street, across New Holland Avenue, and entering the alley behind Mathewson's residence. (Id.)

Rutter and Moore reentered the rear of the house at 710 North Franklin Street and Mathewson, who was in her second floor bedroom, was awakened after hearing noises downstairs. (Rutter Nov. 3, 2016 Slip op. at 4.) She was confronted by Rutter and Moore on the second floor of her home and retreated back into her bedroom. The intruders forced their way into her bedroom and bound Mathewson's hands behind her back with an extension cord. It was while Mathewson was bound upstairs in her bedroom that the PIN number for her bank card was obtained from her, and entered and saved in the "note" section of her iPhone at 4:57 a.m. (Id.)

Rutter stayed with the victim in her home while Moore removed Mathewson's bicycle from the garage, rode to where her vehicle had earlier been left on East Marion Street, drove the vehicle back to the Franklin Street house and re-parked it in the garage. This is confirmed by security camera footage showing Moore riding Mathewson's bicycle, at approximately 5:00 a.m., from the alleyway behind her house onto Reynolds Avenue, then south on North Franklin Street in the direction of Rutter's

4

house. (Rutter Nov. 3, 2016 Slip op. at 4-5.) The bicycle, and the milk crate and bungee cords that had been attached to Mathewson's bicycle, were later found discarded next to Rutter's residence at 730D East Marion Street. Minutes later, the victim's car, which had been parked near Rutter's home, is seen coming out of Burrowes Avenue onto North Franklin Street and travels behind the victim's house. Moore parked the car in the garage and took off on foot. (Id.)

At approximately 5:10 a.m., Moore is seen walking from Reynolds Avenue onto North Franklin Street to the Turkey Hill on New Holland Avenue. (Rutter Nov. 3, 2016 Slip op. at 5.) Moore is caught on camera withdrawing $500 from Mathewson's bank account from the Turkey Hill ATM at approximately 5:18 a.m. Moore is next observed on camera running on New Holland Avenue to North Franklin Street at 5:25 a.m. (Id.) Moore split Mathewson's money with Rutter when he returned to Mathewson's house. (Id. at 5-6.)

Over the next 55 minutes, Nicole Mathewson was brutally murdered. Rutter explained to the police that Mathewson had to be killed because she had seen Moore's face.[5] (Rutter Nov. 3, 2016 Slip op. at 6.) The "Scene Reconstruction" from the Lancaster County Forensic Unit Bloodstain Pattern Analysis Report prepared by Detective Scott Eelman detailed the initial assault on Mathewson in her bedroom:

> The site of the initial bloodletting event is the second floor east bedroom. The height of the bloodstains, none of which were higher than 36 inches, indicates that the victim was on or near the floor at the time of the bloodletting events. The impact spatter patterns in different directions

---

[5]Rutter, on the other hand, claimed to be wearing a mask. (Rutter Nov. 3, 2016 Slip op. at 6 n.3) A mask was found in Mathewson's car and DNA analysis confirmed that Rutter had in fact worn the mask. (Id.)

indicate that there were a minimum of seven blows. Based on the type of injuries to her head and the impact spatter, the blows were created with a larger blunt or dull edged item. The pillow found in the hallway was initially under the victim's head at the time of the blows. Based upon the impact spatter patterns and the void patterns, at least one of the actor(s) stood on the south side of the area rug as the blows were inflicted. . . ."

(Id.) Rutter identified the weapon used on Mathewson as a shovel.[6] (Id.)

Detective Eelman further reconstructed the scene as the assault moved from the second floor bedroom to the first floor living room:

[Mathewson] was then dragged from the east bedroom feet first down the hallway and laid at the top of the steps. This can be deduced from the wipe pattern of the blood soaked hair and the lack of footwear impressions in the wipe patterns across the second floor hallway. The pooling bloodstain in that area indicates a lack of movement and continued bleeding for a period of time.

The actor(s) then dragged or pushed her down the stairs causing her head to move from one side of the stairs to the other as she traveled down the stairs. This can be deduced by the wipe patterns created by the bloody hair contacting the south wall at the top of the steps, the wipe patterns created by the bloody hair contacting the north wall of the stairway about 5 stairs from the top and wipe patterns created by the bloody hair making contact with the south wall of the stairway approximately 5 stairs from the bottom. At the bottom, she either struck the bottom of the stairs with her lower half causing the upper half to rotate against the south wall or she was sat upright by the actor(s) and pushed over to get her away from the stairs. This can be deduced by the wipe bloodstain pattern and large volume blood-stain patterns against the south wall at the bottom of the stairs and the arc pattern of movement in the bloodstains.

---

[6]The shovel was never recovered. Moore told the police that the shovel, which had been broken into two pieces, was picked up by him at the bottom of the steps, placed by him in a white plastic trash bag which he found in a linen closet on the second floor, put in the trunk of Mathewson's car, and ultimately thrown in a dumpster at Sterling Place Apartments. Moore described the shovel for police as being three feet long and having "a handle like the type that would be on a sword" with the end being square metal. (Rutter Nov. 3, 2016 Slip op. at 6 n.4.)

6

The victim lay on the floor bleeding from open wounds in the area
of the bottom of the stairs. This is evident by the large volume of
pooling blood in the area of the bottom of the stairs. The victim was
dragged across the living room floor to the area of the radiator on
the east wall. This is evident from the wipe and swipe stains to the
area of pooling at the bottom of the stairs. She was leaned against
the radiator and was then moved in a clockwise direction across the
floor while continuing to bleed from the wounds to her head. She
was again moved to her final rest position most likely by rotating her
body. This was evident from the wipe and swipe stains in the area
of the larger pooled bloodstain. There were further blows that
occurred in this area to include impact spatter under the end table
next to the couch. The victim lay here with continuing blood flow
from the open wounds.

(Rutter Nov. 3, 2016 Slip op. at 7.) Once at the bottom of the stairs, Mathewson was

tied to the banister and choked with an extension cord, a belt, and a scarf. (Id. at 7-8.)

She was finally stabbed in the back multiple times. (Id. at 8.)

The Postmortem Report prepared by Wayne K. Ross, M.D., Forensic

Pathologist, described Mathewson's injuries:

There is evidence of multiple strikes to her head and body due to
shovel impact, and multiple stab wounds secondary to being stabbed
with a knife. Although there are multiple stab wounds and there is
evidence of hemorrhage in these areas, the knife does not penetrate
into the vertebral column of the neck nor does it penetrate into the
chest. The stab wound paths are front to back or back to front and
extended through the subcutaneous fat and musculature. They are
all within 1 inch or so. The bruises to the back are compatible with
blunt force trauma to that region. The bruises to the heart and liver
are compatible with significant chest compression including
suffocation. The abrasion pattern to the front of the neck is indicative
of ligature strangulation. The bruises to the hyoid bone and thyroid
cartilage and the left carotid artery indicate severe compression
forces leading to strangulation. The cuts to the right side of the neck
indicate multiple cuts to that area.
The impacts to the head resulted in multiple fractures including a
large curvilinear fracture that extends from the left side of the head to
the right side of the head along the base of the skull. In addition,
there are comminuted fractures noted to the right posterior skull.
Contusions are observed directly underneath this area - to the brain -

7

indicating severe penetrating force one to the brain itself. There is evidence of bleeding on or about the brain including subdural blood due to deceleration injuries or other. The lacerations to the scalp and/or other blunt force impacts such as being pulled down the stairs can cause and/or contribute to the bleeding to the brain.

There are multiple ligatures around the neck. The abrasion pattern is consistent with that from the scarf and/or the electrical cord/other wrapped around her neck. There is also evidence of deep hemorrhage in the neck indicating that she was alive when she was being strangled. This also goes hand in hand with the protruding tongue, the bite mark to the tongue and hemorrhages around the end of the tongue which indicate she is alive and strangled during this time period. The lacerations to her anus, which were photographed and put in cassettes, indicate that she was penetrated. . . .

Bloodstains are identified throughout the house and indicate that she was assaulted in the bedroom, dragged down the stairs and then continually assaulted in these downstairs rooms. . . .

(Rutter Nov. 3, 2016 Slip op. at 8-9.)

After inflicting these fatal injuries upon Nicole Mathewson, Rutter and Moore fled the scene in her car. At approximately 6:21 a.m. Mathewson's car was seen on camera traveling south on North Franklin Street, crossing over New Holland Avenue, in the direction of East Marion Street. (Rutter Nov. 3, 2016 Slip op. at 9.) Rutter was then dropped off at his home by Moore at approximately 6:27 a.m., and Moore proceeded to the Sterling Place Apartments, where Mathewson's vehicle was abandoned. (Id.)

Once home, Rutter Facebook-messaged Moore, took a shower, and went to school with the victim's iPhone to sell. (Rutter Nov. 3, 2016 Slip op. at 9.) At approximately 9:10 a.m., Nicole Mathewson's boyfriend arrived at her home, entered the front door and found the victim nonresponsive.[7] The police were notified and

_____

[7]Mathewson's boyfriend received a telephone call from Mathewson's principal who was concerned for her because she had not arrived at the Brownstown Elementary School where she worked. (Rutter Nov. 3, 2016 Slip op. at 10 n.7)

8

arrived on the scene shortly thereafter, along with medical personnel and the Fire Department. Mathewson was pronounced dead at the scene. (Id. at 10.)

Throughout the school day, Rutter and Moore traded Facebook messages to each other about selling the iPhone, what's going to happen with the stolen car, and buying marijuana. (Rutter Nov. 3, 2016 Slip op. at 10.) After school at approximately 3:51 p.m., Rutter Facebook-messaged Moore asking "if the time is up and can [you] grab more bread," an apparent reference to checking whether the ATM card belonging to Mathewson could be used to withdraw more money from her account. Rutter went home briefly at 5:30 p.m. and hid Mathewson's iPhone in his bedroom before going back to McCaskey. Rutter then attended a basketball game at the high school at 7:00 p.m., where he conversed with Moore over Facebook regarding the police finding the body. (Id.)

Later that evening, the Lancaster City Police received information from a McCaskey High School student that Rutter was in possession of an iPhone which appeared to have belonged to Mathewson. (Rutter Nov. 3, 2016 Slip op. at 11.) Around 9:00 p.m., police went to Rutter's residence and, after a consent to search was received from Rutter's parents, police seized an iPhone, iPad and laptop computer belonging to Mathewson which had been hidden in Rutter's bedroom. (Id.)

Shortly thereafter, at approximately 10:00 p.m. on December 15, 2014, as he was walking home from McCaskey High School, Rutter was arrested for possession of stolen property. (Rutter Nov. 3, 2016 Slip op. at 11.) At the police station, Rutter's belongings were inventoried. Among the things found on his person was approximately $230 – what was left of his half of the $500 taken from Mathewson's account after

9

having paid for admission to the basketball game and having bought some food. (Id.) After signing a **Miranda** Warnings waiver, and in the presence of his mother, Rutter gave a video and audio recorded statement to the police in which he admitted to conspiring with Moore to burglarize Mathewson's home, steal her belongings, unlawfully access her bank account, and ultimately kill her. (Id.)

On December 16, 2014, the police located the victim's vehicle in the parking lot at Sterling Place Apartments. The same day, Moore was arrested inside an apartment there on a receiving stolen property warrant. At the police station, Moore's clothing was removed and blood was observed on his sweat pants. (Moore Booking Report.) The next day, Moore was charged with criminal homicide, involuntary deviate sexual intercourse,[8] burglary, criminal conspiracy to commit burglary, robbery, access device fraud, receiving stolen property, and theft by unlawful taking.[9]

Moore made a knowing, voluntary and intelligent waiver of his right to a preliminary hearing on January 9, 2015 (see Waiver of Preliminary Hearing signed by Moore), and met with the police later that afternoon for an interview. After signing a **Miranda** Warnings waiver, and in the presence of his attorney, Moore gave a video and audio recorded statement to the police in which he admitted to his participation with Rutter in burglarizing Mathewson's home, stealing her belongings, and unlawfully accessing her bank account. He denied any responsibility for Mathewson's death,

---

[8]The forensic evidence established that the victim had been anally penetrated by force. (See Moore Criminal Complaint, Affidavit of Probable Cause at ¶ 8.)

[9]18 Pa.C.S.A. § 2501(a), 18 Pa.C.S.A. § 3502(a)(1), 18 Pa.C.S.A. § 903, 18 Pa.C.S.A. § 3701(a)(1)(iv), 18 Pa.C.S.A. § 4106(a)(1)(i), 18 Pa.C.S.A. § 3925(a), 18 Pa.C.S.A. § 3123(a)(1), and 18 Pa.C.S.A. § 3921(a), respectively.

10

although he acknowledged that she was still alive when he entered the home the last time, and he failed to take any action to help her. (Moore Police Interview at 3-14.)

Pursuant to Rule 802 of the Pennsylvania Rules of Criminal Procedure, the Commonwealth filed a Notice of Intent to Seek a Sentence of Death against Moore on January 30, 2015. Specifically, the Commonwealth believed it could prove two statutory aggravating circumstances: (1) a killing while in the perpetration of three felonies, namely involuntary deviate sexual intercourse, burglary and robbery, 42 Pa.C.S.A. §§ 9711(d)(6); and (2) the killing was committed by means of torture. 42 Pa.C.S.A. §§ 9711(d)(8). On February 6, 2015, the Commonwealth gave notice pursuant to Pa.R.Crim.P. 582(b)(1) of its intent to consolidate the cases of Rutter and Moore for trial.

On September 28, 2015, Moore filed an Omnibus Pre-Trial Motion which included, *inter alia*, a motion to continue trial, which was then scheduled for January 11, 2016. Following a conference with counsel, trial was rescheduled to April 12, 2016. On January 11, 2016, Moore filed a motion to sever his case from his juvenile co-defendant, Rutter.

In exchange for the Commonwealth dropping the death penalty, on February 5, 2016, Moore agreed to enter a plea of guilty to the charges of first degree murder, burglary, criminal conspiracy, robbery, receiving stolen property, and access device fraud. (N.T., Moore Guilty Plea/Sentencing at 2-3.) The receiving stolen property[10] and involuntary deviate sexual intercourse charges were *nolle prossed* as part of the

---

[10]This charge related to the victim's automobile. (*See* Information at Count 6.)

11

negotiated plea agreement. (Id. at 3.) The proffered negotiated plea was accepted after a thorough on-the-record colloquy established that Moore was entering the plea knowingly, voluntarily and intelligently. (Id. at 35, 54.)

In accordance with the plea agreement, the Court imposed a mandatory sentence of life without the possibility of parole on the first degree murder conviction.[11] (N.T., Moore Guilty Plea/Sentencing at 54.) The Court further ordered the following consecutive sentences as per the negotiated plea agreement: (1) 5 to 10 years' incarceration on the burglary conviction; (2) 5 to 10 years' incarceration on the criminal conspiracy conviction; and (3) 10 to 20 years' incarceration on the robbery conviction. (Id. at 54-55.) Finally, concurrent sentences of one to two years' incarceration were imposed on the theft by unlawful deception conviction and access device fraud convictions. (Id. at 55.) Accordingly, the aggregate sentence is life in prison without the possibility of parole, with a consecutive period of incarceration of 20 to 40 years. Restitution was ordered in the amount of $38,566.77, to be amended for the costs of ongoing counseling for the victim's family members. (Id.) Moore's sentence also included fines and costs associated with each count. (Id. at 2.)

At the conclusion of the guilty plea/sentencing hearing, I reviewed with Moore his rights to file post sentence motions within 10 days and a direct appeal to the Superior Court of Pennsylvania within 30 days. (N.T., Moore Guilty Plea/Sentencing at 57.) Moore's post sentence rights were also set forth in the seven-page written colloquy

---

[11]Pennsylvania law mandates that if a person is found guilty of first degree murder and does not receive the death penalty he or she will receive a sentence of life imprisonment without the possibility of parole. *See* 18 Pa.C.S.A. § 1102(a)(1). (N.T., Moore Guilty Plea/ Sentencing at 23.)

12

form signed by Moore. (See Moore Guilty Plea Colloquy and Post-Sentence Rights at ¶¶ 55-75.) Moore filed no post sentence motions, nor did he file a direct appeal to the Superior Court of Pennsylvania from his judgment of sentence imposed on February 5, 2016. Moore was represented at his guilty plea and sentencing by court-appointed counsel, Jeffrey A. Conrad, Esquire, and Edwin G. Pfursich, IV, Esquire.

On January 31, 2017,[12] Moore, acting *pro se*, filed the instant timely petition for post conviction collateral relief,[13] challenging his attorney's effectiveness and the alleged unlawful inducement of his guilty plea. (See *Pro Se* PCRA Petition at ¶ 10.) Pursuant to Rule 904(A) of the Pennsylvania Rules of Criminal Procedure, Randall L. Miller, Esquire, was appointed to represent Moore on his collateral claims and was granted leave to file an amended petition, if appropriate.

After a careful and conscientious review of the entire record, Attorney Miller concluded that the *pro se* petition did not present any issues of arguable merit and was frivolous as a matter of law. Accordingly, he submitted a "no merit" letter[14] and request to withdraw on April 24, 2017.

After reviewing the *pro se* PCRA petition and counsel's "no merit letter," I found that there were no disputed issues of fact, Moore was not entitled to post conviction

---

[12]The pleading is deemed filed on the date of mailing, January 31, 2017, rather than the date of docketing, February 9, 2017, pursuant to the "prisoner mailbox rule." *See* **Commonwealth v. Crawford**, 17 A.3d 1279, 1281 (Pa. Super. 2011) ("Under the prisoner mailbox rule, we deem a *pro se* document filed on the date it is placed in the hands of prison authorities for mailing.").

[13]I note that Moore's PCRA petition was filed within one year of the date his judgment became final. As such, his petition was filed in a timely manner. *See* 42 Pa.C.S.A. § 9545(b).

[14]This was filed pursuant to **Commonwealth v. Turner**, 518 Pa. 491, 544 A.2d 927 (1988), and **Commonwealth v. Finley**, 379 Pa. Super. 390, 550 A.2d 213 (1988).

13

collateral relief, and no purpose would be served by any further proceedings. Therefore, on April 25, 2017, pursuant to Pa.R.Crim.P. 907(1), I filed a notice of my intention to dismiss the *pro se* PCRA petition without a hearing. Moore was given 30 days to file an amended petition or to otherwise respond to the Court's Notice. He submitted a timely response on May 25, 2017. This matter is now ripe for disposition.

## II.     Eligibility for PCRA Relief

Initially, I note that "[t]he entry of a guilty plea constitutes a waiver of all defenses and defects except claims of lack of jurisdiction, invalid guilty plea, and illegal sentence." **Commonwealth v. Kennedy**, 868 A.2d 582, 593 (Pa. Super. 2005). Moore has not challenged the jurisdiction of this Court or the legality of his sentence. Moore does dispute, however, the validity of his guilty plea. In such a case, post conviction relief is available if a petitioner pleads and proves by a preponderance of the evidence that his guilty plea was unlawfully induced where the circumstances made it likely the inducement caused the petitioner to plead guilty and the petitioner is innocent. *See* 42 Pa.C.S.A. § 9543(a)(2)(iii).[15]

While a defendant is entitled to effective representation during the plea process, **Commonwealth v. Bedell**, 954 A.2d 1209, 1212 (Pa. Super. 2008), allegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness *caused* the defendant to enter an involuntary or unknowing

---

[15]Since Moore pleaded guilty, the truth-determining process is not implicated under 42 Pa.C.S.A. § 9543(a)(2)(ii). Rather, his ineffectiveness claim in the context of an attack on the validity of his guilty plea falls under § 9543(a)(2)(iii).

14

plea. **Commonwealth v. Wah**, 42 A.3d 335, 338-39 (Pa. Super. 2012) (citations and quotation marks omitted). This is similar to the "manifest injustice" standard used when evaluating a motion to withdraw a plea after sentencing. **Bedell**, *supra*. "The law does not require that [the defendant] be pleased with the outcome of his decision to enter a plea of guilty; rather '[a]ll that is required is that [the defendant's] decision to plead guilty be knowingly, voluntarily and intelligently made.'" **Commonwealth v. Brown**, 48 A.3d 1275, 1277 (Pa. Super. 2012) (citation omitted). Once a defendant enters a guilty plea, it is presumed he was aware of his actions and, thus, the burden of demonstrating involuntariness is upon him. **Commonwealth v. Willis**, 68 A.3d 997, 1002 (Pa. Super. 2013).

In determining whether a defendant entered into a plea of guilty knowingly, voluntarily and intelligently, the PCRA court "is free to consider the totality of the circumstances surrounding the plea, . . . including, but not limited to, transcripts from other proceedings, 'off-the-record' communications with counsel, and written plea agreements." **Commonwealth v. Allen**, 557 Pa. 135, 146-47, 732 A.2d 582, 588-89 (1999). Moreover, "[a] defendant is bound by the statements made during the plea colloquy, and a defendant may not later offer reasons for withdrawing the plea that contradict statements made when he pled." **Brown**, *supra*.

To succeed in showing prejudice for a claim of ineffectiveness in connection with a guilty plea, the defendant "must show that it is reasonably probable that, but for counsel's errors, he would not have pleaded guilty and would have gone to trial." **Commonwealth v. Hickman**, 799 A.2d 136, 141 (Pa. Super. 2002). Moreover, where

15

the defendant enters his plea on the advice of counsel, "the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." Id. (*quoting* **McMann v. Richardson**, 397 U.S. 759, 771 (1970)).

Here, Moore claims his trial counsel's ineffectiveness caused him to enter an invalid plea. In support of this argument, he avers: (1) trial counsel allowed Moore to enter into a negotiated guilty plea that was not intelligent, knowing and voluntary; (2) Moore's guilty plea was unlawfully induced when his trial attorney, Mr. Conrad, informed him that he may never hold his child again during a recess in the guilty plea/sentencing hearing outside the presence of the Court; (3) trial counsel should have litigated the issues contained in the omnibus pretrial motion; (4) trial counsel allegedly forged Moore's signature on the waiver of arraignment form; and (5) trial counsel was ineffective because he failed to provide Moore with a defense or exculpatory evidence favorable to Moore. For the reasons that follow, Moore's claim of ineffective assistance of counsel must fail.

## III. Discussion

I begin my analysis as to the voluntary, knowing and intelligent nature of Moore's plea by examining the totality of the circumstances surrounding the plea. The procedure for pleas and plea agreements is set forth in Rule 590 of the Pennsylvania Rules of Criminal Procedure. Before a judge may accept a plea of guilty, he must determine, after inquiry of the defendant, that the plea is understandingly and

16

voluntarily tendered. Pa.R.Crim.P. 590(A)(3).[16] The comment to this Rule notes, that "at a minimum," the judge should ask the following questions in the guilty plea colloquy: (1) Does the defendant understand the nature of the charges to which he is pleading guilty; (2) Is there a factual basis for the plea; (3) Does the defendant understand that he has the right to trial by jury; (4) Does the defendant understand that he is presumed innocent until he is found guilty; (5) Is the defendant aware of the permissible range of sentences and/or fines for the offenses charged; and (6) Is the defendant aware that the judge is not bound by the terms of any plea agreement tendered unless the judge accepts such agreement. Our Supreme Court has held that inquiry into these six areas is essential to ensure a knowing, voluntary and intelligent plea. **Commonwealth v. Flanagan**, 578 Pa. 587, 605, 854 A.2d 489, 500 (2004). *See also* **Commonwealth v. Willis**, 471 Pa. 50, 51-52, 369 A.2d 1189, 1189-90 (1977); **Commonwealth v. Bedell**, 954 A.2d 1209, 1212 (Pa. Super. 2008).

The comment to Rule 590 does allow that a determination into these areas may be accomplished by a written colloquy that is "read, completed, signed by the defendant, and made part of the record of the plea proceedings," supplemented by some on-the-record oral examination. In this case, the record establishes that I

---

[16]Rule 590 provides in relevant part as follows:
(1) Pleas shall be taken in open court.
(2) A defendant may plead not guilty, guilty, or, with the consent of the judge, nolo contendere. If the defendant refuses to plead, the judge shall enter a plea of not guilty on the defendant's behalf.
(3) The judge may refuse to accept a plea of guilty or nolo contendere, and shall not accept it unless the judge determines after inquiry of the defendant that the plea is voluntarily and understandingly tendered. Such inquiry shall appear on the record.
Pa.R.Crim. P. 590(A).

17

conducted a lengthy and thorough inquiry into the six designated areas identified above. I advised Moore of the charges against him and explained the elements of those offenses as defined by the Crimes Code and the Pennsylvania Standard Jury Instructions (Criminal). (N.T., Moore Guilty Plea/Sentencing at 19-26.) Moore was also advised that by pleading guilty he was waiving his rights to a jury trial, the presumption of innocence, and other relevant attributes of procedural due process. (Id. at 5-8, 13, 19.) He acknowledged that he understood that he was innocent until proven guilty, he did not have to plead guilty, and that it was his choice to plead guilty. (Id. at 6, 13)

The maximum sentences and sentencing guidelines for each charge were also reviewed with Moore during the colloquy. (N.T., Moore Guilty Plea/Sentencing at 23-28.) Moore stated that he understood that the maximum sentence, if all the charges were sentenced consecutively, would be life without parole plus 81 years in jail, and a fine of $130,000.00. (Id. at 27.)

As required by Pa.R.Crim.P. 590, a trial court must also satisfy itself that there is a factual basis for the plea. **Commonwealth v. Fluharty,** 429 Pa. Super. 213, 219, 632 A.2d 312, 315 (1993). In the instant case, I reviewed the factual basis of the plea, as summarized by First Assistant District Attorney Christopher Larsen. (N.T., Moore Guilty Plea/Sentencing at 31-33.) Moore admitted to the facts recited by the prosecutor which formed the bases for the charges; thus, defeating a claim of innocence. (Id. at 33.) There were clear admissions of guilt by Moore, as well as substantial independent evidence of guilt. In light of the totality of the circumstances surrounding the plea in this case, it is clear that there was a sufficient factual basis for the plea to be deemed knowingly and voluntarily entered. For Moore to now suggest that he was unlawfully

18

induced into entering into the negotiated plea because he is innocent of the offenses to which he pled guilty is contrary to the facts of this case.

In addition to the colloquy in open court, Moore signed a 7-page, 77-question written guilty plea "long form" completed by defense counsel. (*See* Moore Guilty Plea Colloquy.) In this document, Moore manifested his understanding of the offenses against him, the maximum sentences and the procedural due process rights waived by a guilty plea. He indicated that he reviewed the colloquy form with his attorney and signed it. (Id.) Moore had no questions of his attorney or of the Court regarding the form.

Thus, the record clearly establishes that Moore was aware of his charges (N.T., Moore Guilty Plea and Sentencing at 20-26), that he understood the nature of these charges (Id.), that he was giving up his right to a jury trial and the presumption of innocence (Id. at 5, 13), and that the murder charge carried a maximum jail term of life without parole. (Id. at 27-28.) Moreover, Moore indicated that he knew he did not have to plead guilty and that it was his voluntary decision to plead guilty. (*See* Moore Guilty Plea Colloquy at ¶¶ 10, 49.) Moore denied being forced to plead guilty, and indicated that it was his decision to plead guilty of his own free will. (Id. at ¶¶ 50-51.)

In the instant case, Moore was facing a grim alternative when he elected to enter a negotiated plea to the murder charge. He faced a possible death penalty if convicted at trial. (N.T., Moore Guilty Plea/Sentencing at 18; *see also* Moore Guilty Plea Colloquy at ¶ 35.) Moore had absolutely nothing to gain by a trial and much to gain by pleading. Because of the overwhelming evidence against him, a trial was precisely what neither Moore nor his attorney wanted. The record demonstrates that Moore voluntarily,

19

knowingly and understandingly consented to the imposition of a life sentence because the Commonwealth had sufficient evidence (1) to convince a jury beyond a reasonable doubt that Moore was guilty of all charges and (2) to prove the two statutory aggravating circumstances to support the death penalty.

By the nature, extent and tone of the guilty plea hearing, this Court was well satisfied that Attorney Conrad had fully executed his duties in advising Moore of the nature of the charges and the possible consequences of his plea. Defense counsel advised the Court that his client was entering a knowing, voluntary and intelligent plea. (N.T., Moore Guilty Plea/Sentencing at 34.)

Based upon the representations by Moore, his attorney and the Commonwealth, the negotiated guilty plea presented on Moore's behalf was accepted by the Court. (N.T., Moore Guilty Plea/Sentencing at 35.) On review, considering all the circumstances attendant to the plea, including the adequacy of the oral and written plea colloquies, Moore's responses therein, and the representations by defense counsel, the guilty plea was knowing, voluntary and intelligent, and was properly accepted.

Moore, however, claims that his guilty plea is nonetheless invalid based on the ineffective assistance of counsel. Specifically, Moore now contends that, despite what was said during the oral colloquy and what was specifically spelled out in the written colloquy, it was not his intention to plead guilty and that counsel unlawfully induced him to plead guilty by threatening that if Moore's case went to trial and he was convicted, he would get the death penalty and would never hold his child again. (*See Pro Se* PCRA Petition at ¶ 15(A)(1).) The record belies this assertion.

20

At the guilty plea/sentencing hearing, Moore testified that it was his decision to waive a jury trial and plead guilty of his own free will, and that no promises, threats or guarantees had been made to or against him to force him to plead guilty. (N.T., Moore Guilty Plea/Sentencing at 6, 31; see also Moore Guilty Plea Colloquy at ¶¶ 49-52.) This exchange with the Court occurred after the recess in the proceeding wherein the alleged "threat" was made by Attorney Conrad. Thus, the only evidence suggesting that Moore's guilty plea was induced by counsel's alleged threat is Moore's proffered testimony, which directly contradicts his own statements made during the oral plea colloquy and on the written colloquy.

> The longstanding rule of Pennsylvania law is that a defendant may not challenge his guilty plea by asserting that he lied while under oath, even if he avers that counsel induced the lies. . . . A person who elects to plead guilty is bound by the statements he makes in open court while under oath and he may not later assert grounds for withdrawing the plea which contradict the statements he made at his plea colloquy. . . .
>
> . . .
> A criminal defendant who elects to plead guilty has a duty to answer questions truthfully. We [cannot] permit a defendant to postpone the final disposition of his case by lying to the court and later alleging that his lies were induced by the prompting of counsel. . . .

**Commonwealth v. Pollard**, 832 A.2d 517, 523-24 (Pa. Super. 2003) (citations omitted).

Moreover, this alleged threat by trial counsel did not render Moore's decision to plead guilty one that was not knowing, intelligent and voluntary. In the Commonwealth's formal notice pursuant to Pa.R.Crim.P. 802 of its intent to seek a sentence of death against Moore, the Commonwealth indicated that it believed it could prove two statutory aggravating circumstances at trial: (1) Moore committed the killing

21

while in the perpetration of three felonies, namely involuntary deviate sexual intercourse, burglary and robbery, 42 Pa.C.S.A. § 9711(d)(6); and (2) Moore committed the murder by means of torture. 42 Pa.C.S.A. § 9711(d)(8). Given the extensive testimonial, physical and expert evidence in this case, including Moore's own admissions, and the brutal nature of the victim's death, a sentence of death was a very real possibility for Moore. Being on death row would prevent Moore from holding his child again.

Under the terms of the negotiated plea, the Commonwealth agreed to forego its opportunity to seek imposition of the death penalty and, in addition, agreed to *nolle pros* two of the charges in return for Moore's plea of guilty to first degree murder. It was clear from the responses which Moore made during the careful, lengthy and thorough guilty plea colloquy that his desire to avoid exposure to the death penalty was the reason for his plea. Thus, Moore gained a substantial benefit by pleading guilty since, by so doing, he not only eliminated the potential for the imposition of the death sentence but he also avoided potential convictions and sentences on two other charges which the Commonwealth had agreed to *nolle pros* in accordance with the terms of the negotiated plea. Moore further secured the opportunity of holding his child again, albeit in a state correctional institution.

Finally, it is well settled that the threat of receiving the death penalty after trial is not an illegal inducement of a guilty plea. **Commonwealth v. Blackwell**, 647 A.2d 915, 922-23 (Pa. Super. 1994). *See also* **Commonwealth v. Wilcox**, 312 Pa. Super. 184, 189-90, 458 A.2d 575, 578-79 (1983) (guilty plea not involuntary on ground that

22

prosecutor unfairly bargained with an unrealistic threat of the death penalty where desire to avoid exposure to death penalty was reason for plea to murder). Accordingly, this issue lacks merit.

Next, Moore argues that his trial counsel was ineffective for failing to litigate the issues contained in his omnibus pretrial motion. During the oral colloquy, Moore acknowledged that by pleading guilty he was waiving any rights that may exist with regard to the two pretrial motions which his counsel had filed, and was, essentially, "asking that those motions be dismissed or not addressed." (N.T., Moore Guilty Plea/Sentencing at 8.) Likewise, in the written guilty plea colloquy, Moore manifested his understanding that, by pleading guilty, he was giving up his right to be heard on any filed pretrial motions. (Moore Guilty Plea Colloquy at ¶ 23.) Thus, Moore's claim is defeated by his own statements made during the oral plea colloquy and on the written colloquy.

Moore's next issue regarding counsel's alleged fraudulent waiver of his arraignment[17] also lacks merit. As noted above, to succeed in showing prejudice for a claim of ineffectiveness in connection with a guilty plea, the defendant "must show that it is reasonably probable that, but for counsel's errors, he would not have pleaded guilty

---

[17]A defendant may waive his appearance at a formal arraignment if "the defendant *and* counsel sign and file with the clerk of the courts a waiver of appearance at arraignment," with an acknowledgment that the defendant understands the nature of the charges and is advised of his due process rights to file pre-trial motions and the time periods associated with each. Pa.R.Crim.P 571(D)(2) (emphasis added). Moore claims Attorney Conrad "commited [sic] fraud by forging [Moore's] signature to waive Arraignment on February 13th, 2015." (*See Pro Se* PCRA Petition at ¶ 15(B)(9); *see also Pro se* PCRA Petition, Exhibit "A".) In fact, Attorney Conrad signed Moore's name and then placed his initials beside the signature, indicating it was not an attempt at forgery.

23

and would have gone to trial." **Hickman**, 799 A.2d at 141. Moore's claim regarding trial counsel's alleged forgery on a waiver of arraignment form had no bearing on his decision to plead guilty. Moore cannot demonstrate how this allegation, if true, would have effected the outcome of these proceedings; thus, he cannot prove prejudice.

"The main purposes of arraignment are: to ensure that the defendant is advised of the charges; to have counsel enter an appearance. . .; and to commence the period of time within which to initiate pretrial discovery and file other motions." Pa.R.Crim.P. 571, Comment. The record establishes that Moore was fully advised of the nature of the charges over a month before his scheduled formal arraignment[18] and that trial counsel, who had entered his appearance, timely initiated pretrial discovery and filed other relevant motions.[19] Thus, the main purposes of arraignment had been satisfied, and Moore can establish no prejudice by counsel's waiver of arraignment. *See* **Commonwealth v. Johonoson**, 844 A.2d 556, 564 (Pa. Super. 2004) (ineffectiveness claim based upon allegation that defense counsel forged defendant's signature on a wavier of arraignment failed for lack of demonstrable prejudice); **Commonwealth v. Keyser**, 2420 EDA 2015, 2016 WL 5266600, at *9 (Pa. Super. July 20, 2016) (same). This claim, therefore, is frivolous and must be rejected. *See* **Commonwealth v. Paolello**, 542 Pa. 47, 665 A.2d 439, 454 (1995) (where it is clear that a defendant has

---

[18]Following the waiver of his preliminary hearing on January 9, 2015, Moore met with the police later that afternoon for an interview. At that time, Moore was fully advised of the nature of the charges against him. (*See* Moore Police Interview.)

[19]*See, for example*, motion for funds to hire investigator filed March 13, 2015, motion for funds to hire psychologist filed July 8, 2015, motion for funds to retain mitigation specialist filed July 20, 2015, and omnibus pretrial motion filed September 28, 2015.

24

failed to prove prejudice, an ineffective assistance claim may be disposed of on that basis alone).

Lastly, Moore maintains that trial counsel was ineffective because he failed to provide Moore with a defense or present exculpatory evidence favorable to Moore. This allegation is without arguable merit as such an allegation is not cognizable under the PCRA. As noted above, all grounds of appeal are waived after a guilty plea has been entered except challenges to the voluntariness of the plea, the jurisdiction of the sentencing court, and the legality of the sentence. **Kennedy**, 868 A.2d at 593. Moore's sole challenge is to the validity of his plea, and this claim simply does not impact the validity of Moore's plea.

Assuming, *arguendo*, that the issue of trial counsel's failure to establish a defense or present exculpatory evidence somehow implicates an invalid plea, the issue still has no merit. Moore does not suggest any defense in his *pro se* petition that trial counsel failed to explore.

At the guilty plea/sentencing hearing, Moore admitted that he can read, write and understand the English language and that he graduated from high school. (N.T., Moore Guilty Plea/Sentencing at 5.) He admitted that he has never been treated for any type of mental illness. (Id.; *see also* Moore Guilty Plea Colloquy at ¶¶ 3-6.) A mental health defense was not a viable option for trial counsel to present.[20]

---

[20]Trial counsel received $2,500.00 to hire the services of a psychologist for purposes of Moore's defense. Specifically, counsel noted in the motion for funds that "it is imperative that [Moore] have a complete psychological evaluation performed by a competent medical expert to determine [Moore's] cognitive abilities." (Motion for Funds to Hire Psychologist at ¶ 6.) Had the evaluation revealed a significant mental impairment, trial counsel would have presented a mental infirmity defense.

25

If Moore's claim of ineffectiveness is related to counsel's failure to properly investigate Moore's claim of innocence, Moore must point to a specific harm suffered as a result of trial counsel's alleged failure, and must show that an investigation would have uncovered something that would have been helpful to Moore's case. *See* **Commonwealth v. Rainey**, 593 Pa. 67, 102, 928 A.2d 215, 236 (2007). It is important to first note that Moore's claim of innocence is contradicted by his admission of the facts supporting the elements of each offense to which he pleaded guilty. (N.T., Moore Guilty Plea/Sentencing at 33.) Additionally, Moore's recorded statement to the police, the recorded statement of co-conspirator, Rutter, the scientific evidence connecting Moore to the crime scene, and Moore's use of the victim's ATM card the night of the homicide, defeat Moore's claim of innocence.

Given the evidence in this case, Moore cannot establish that there is a reasonable probability that the outcome of his case would have been different but for counsel's alleged ineffectiveness in failing to investigate for exculpatory evidence. *See* **Chmiel**, 612 Pa. at 362, 30 A.3d at 1127-28. There was no lack of evidence linking Moore to these crimes. Accordingly, Moore has not met the burden of proof for this PCRA claim.

The Commonwealth was seeking the death penalty in this case, and the plea bargain secured by defense counsel avoided a potential death penalty. Moore may not be pleased with the results of his negotiated guilty plea, but he cannot now obtain relief by claiming he felt pressured by trial counsel to plead guilty. The evidence simply does not support Moore's claim of unlawful inducement or ineffective assistance of counsel.

26

## IV.    Conclusion

For the reasons set forth above, Thomas Gregory Moore's *pro se* petition for post conviction collateral relief will be dismissed without further proceedings.

Accordingly, I enter the following:

**IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA**
**C R I M I N A L**

COMMONWEALTH OF PENNSYLVANIA     :

           v.                 :     No. 0287- 2015

THOMAS GREGORY MOORE       :

**O R D E R**

AND NOW, this 30th day of May, 2017, it is hereby ORDERED that Thomas Gregory Moore's *pro se* petition for post conviction collateral relief is DISMISSED without a hearing. There are no genuine issues concerning any material fact, Moore is not entitled to post conviction collateral relief, and no purpose would be served by any further proceedings.

Further, the April 24, 2017, letter of Moore's court-appointed attorney, Randall L. Miller, Esquire, a copy of which was attached to this Court's Rule 907 Notice filed on April 25, 2017, states that the *pro se* petition is lacking in merit as a matter of law, a conclusion with which I agree after my independent review of the record. Accordingly, Mr. Miller is granted leave to withdraw as counsel.

Pursuant to Pa.R.Crim.P. 907(4), this Court advises Moore that he has the right to appeal from this Order. Moore shall have 30 days from the date of this final Order to appeal to the Superior Court of Pennsylvania. Failure to appeal within 30 days will result in the loss of appellate rights.

BY THE COURT:

DAVID L. ASHWORTH
JUDGE

Copies to:     Travis S. Anderson, Assistant District Attorney
               Randall L. Miller, Esquire
               Thomas Gregory Moore, #MP-1983, SCI-Albion, 10745 Route 18, Albion, PA
               16475-0002 – CERTIFIED MAIL

# IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
# C R I M I N A L

COMMONWEALTH OF PENNSYLVANIA     :
 

v.     :     No. 0238 - 2015

THOMAS G. MOORE     :

## Pa.R.A.P. 1925(a) MEMORANDUM OF OPINION

BY:   ASHWORTH, J., JUNE 28, 2017

Defendant Thomas G. Moore has filed an appeal to the Superior Court of Pennsylvania from the Order of this Court entered on May 30, 2017, denying Defendant's *pro se* PCRA petition. The reasons for that decision are stated in my May 30, 2017, Opinion. Therefore, I rely on that Opinion to comply with Pa.R.A.P. 1925(a).

BY THE COURT:

DAVID L. ASHWORTH
JUDGE

Copies to:   Susan E. Moyer, Assistant District Attorney
Thomas G. Moore, #MP 1983, SCI-Albion, 10745 Route 18, Albion, PA
16475-0002